A97A0856. HOLT v. THE STATE.
(487 SE2d 629)

McMURRAY, Presiding Judge.

Defendant appeals his conviction for "giving a false name and a false date of birth to a law enforcement officer" in violation of OCGA § 16-10-25. This Code section makes it unlawful to give a false name, address, or date of birth to "a law enforcement officer in the lawful discharge of his official duties with the intent of misleading the officer as to his identity or birthdate. . . ." We reverse because defendant gave a false name and date of birth to an officer who was not acting within "the lawful discharge of his official duties."

Corporal James Hood of the City of Norcross Police Department was the State's only witness. His testimony — which we quote extensively — reveals the following: Shortly before 11:00 in the morning on June 18, 1996, Corporal Hood observed three African-American "males" in a "suspicious vehicle" slowly "creeping" through an office complex where there had been recent reports of illegal entries into "autos." Because these men "didn't appear . . . to have any apparent

purpose except to be driving around [during normal business hours, the corporal decided to execute a traffic stop based upon his observation of] a kind of webbed crack in the [vehicle's] windshield."

When Corporal Hood signaled for the "suspicious vehicle" to stop, the driver complied, exited his car and stood "outside the driver's side of the vehicle." The two passengers — defendant and another African-American man — remained in the car. Corporal Hood approached the stopped car from the rear and stood "on the passenger side where [he] could see both of the occupants in the vehicle, as well as the driver. . . ." He then "asked the driver if he would place his hands on the car where [he] could see them, and [positioned himself] behind the passengers [so that he] could see both of their hands." The driver produced a valid Georgia driver's license, but could not show proof of insurance. Corporal Hood asked the driver why he and his passengers were driving through the office complex and the driver "told [the corporal] that they were just riding around, but then [said] that they were just looking for a job."

Corporal Hood returned to his patrol car and began preparing traffic citations charging the driver with driving with a cracked windshield and driving without proof of insurance. As the corporal was serving these citations, he kept an eye on the driver's two passengers and deduced that they were "making kind of furtive movements like they were nervous about something. . . ." "Due to that fact and also the suspicious activity [he] observed [(i.e., three men traveling randomly through an office complex during normal business hours)] and the fact that there had been entering autos in the past couple of days in that same parking lot, [Corporal Hood] went ahead and asked the passengers if they had any ID on them and both of them told [him] no." Believing that every citizen is "supposed to have some type of ID with you[,]" Corporal Hood decided to ask the passengers for their names and dates of birth. The corporal wanted this information "so [he] could run them to see if they were wanted and also so [he] could have their names on file in case we had more entering autos in the area."[1]

After running a computer check and questioning the driver about defendant's identity, Corporal Hood suspected that defendant had given him a false name and date of birth. The corporal confronted defendant about this suspicion, and defendant reluctantly

---

[1] Corporal Hood testified that his police file consists of "a little notebook pad" containing a list of persons — identified by name, race, and sex — who the officer believes were involved, at various times, in "suspicious activity." Corporal Hood testified that he believes "it is a good practice [for any law enforcement officer to keep such a notebook, explaining that] if you have any information, you know, it could do you some help in solving a case if you flip back through your notebook and find it."

admitted that he had given the officer a false name and date of birth. As soon as defendant acknowledged his true identity, Corporal Hood arrested defendant and took him into police custody. *Held*:

Defendant first contends the trial court erred in considering proof that he gave Corporal Hood a false name and date of birth, arguing that the corporal gleaned this information during an unlawful police-citizen encounter in violation of his constitutional rights under *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889). Defendant employs similar logic while challenging the sufficiency of the evidence in his second enumeration of error, arguing that Corporal Hood was not "in the lawful discharge of his official duties" when he asked defendant for identification during the traffic stop. We consider these enumerations together because we find it appropriate to measure the performance, vel non, of a law enforcement officer's "official duties" by the standard justifying police "stops" under *Terry v. Ohio*, 392 U. S. 1, supra.

OCGA § 16-10-25 makes it unlawful for any person to give a false name, address, or date of birth "to a law enforcement officer in the lawful discharge of his official duties. . . ." This prohibition against deceitful obstruction of an officer is analogous to OCGA § 16-10-24 (b)'s prohibition against violent obstruction of an officer because both OCGA §§ 16-10-24 (b) and 16-10-25 make it "essential that the State prove beyond a reasonable doubt that the obstruction was knowing and wilful, and that it occurred while the officer was 'in the lawful discharge of his official duties.' OCGA § 16-10-24 (b). See *Hall v. State*, 201 Ga. App. 328 (411 SE2d 274); *Powell v. State*, 192 Ga. App. 688 (3) (385 SE2d 772); *Kight v. State*, 181 Ga. App. 874 (1) (354 SE2d 202); *Carr v. State*, 176 Ga. App. 113 (1) (335 SE2d 622). '(A) police officer is not discharging his lawful duty when he arrests an individual without reasonable or probable cause.' *Brown v. State*, 163 Ga. App. 209, 212 (294 SE2d 305)." (Emphasis omitted.) *Wagner v. State*, 206 Ga. App. 180, 182 (424 SE2d 861). Further, an officer is *not* within the lawful discharge of his official duties when he approaches and questions an individual without specific, articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct. Id. at 181-183. Where circumstances do not provide an officer with articulable suspicion (less than probable cause, but greater than mere caprice) that the law has been or is about to be violated, the officer's act of detaining and questioning an individual is nothing more than a police-citizen encounter outside the scope of the officer's "official" police duties. See *Brooks v. State*, 144 Ga. App. 97, 98 (1) (240 SE2d 593). The controlling issue in the case sub judice is thus whether Corporal Hood's roadside inquiry into defendant's name and date of birth was based upon articulable facts indicating that defendant had engaged in, was engaging in, or was about to engage in crim-

inal activity.

"An investigatory stop may not be based on a hunch or pretext, but must be justified by ' "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. (Cits.)" (Cit.)' *Evans v. State,* 183 Ga. App. 436, 438 (359 SE2d 174) (1987). In determining whether such a stop, made in the absence of an observed violation of law, was justified, the proper inquiry is not merely whether the officer *could* validly have made the stop, but whether under the same circumstances a reasonable officer *would* have done so absent any invalid purpose. *Tarwid v. State,* 184 Ga. App. 853, 854 (363 SE2d 63) (1987). In *Brooks* [*v. State,* 144 Ga. App. 97, 98 (1)], supra, this court held that an officer acted improperly in pursuing for questioning a man he observed looking into the window of one car in a shopping center parking lot and leaving when the officer approached. Id. at 97-99 (1)." (Emphasis in original.) *Hopkins v. State,* 209 Ga. App. 337, 338 (1) (a) (433 SE2d 423). The basis of Corporal Hood's encounter with defendant in the case sub judice was far less substantial.

After Corporal Hood completed the only tenable object of his parking lot investigation (i.e., issuing a driver a citation for driving with a cracked windshield), the corporal directed his attention to the two passengers in the driver's car. He explained that his suspicions were aroused because these men were "making kind of furtive movements like [they were] nervous about something. . . ." Corporal Hood testified that, "[d]ue to that fact and also the suspicious activity [he] observed [(i.e., three men driving randomly through an office complex in Norcross, Georgia during normal business hours)] and the fact that there had been entering autos in the past couple of days in that same parking lot, [he] went ahead and asked the passengers if they had any ID on them. . . ." Corporal Hood explained, during cross-examination, that he then decided to ask the driver's passengers for their names and dates of birth because the suspects could not produce identification papers and, in his view, every citizen is "supposed to have some type of ID with you." The corporal stated that he wanted this information "so [he] could run them to see if they were wanted, and also so [he] could have their names on file, in case we had more entering autos in the area." Specifically, the corporal explained that he wanted to record the passengers' names, race, gender and dates of birth in his "little notebook pad" because he believes it is "good practice" for any law enforcement officer to keep such a notebook. The corporal admitted, however, that he "did not see [the driver's passengers] commit a crime." He simply felt that these men were "suspicious [because they] were in an area where we had entering autos prior, a couple of days ago; and as far as [he] knew, there could have been some that morning." We cannot say that Corporal

Hood's explanation for questioning defendant is sufficient to authorize the trial court's finding, beyond a reasonable doubt, that defendant obstructed an officer who was lawfully discharging his official duties in violation of OCGA § 16-10-25.

What must be minimally articulated in such cases to authorize a finding that an officer is lawfully discharging his "official duties" under OCGA § 16-10-25 are particular facts providing reason for an officer's impression for the need to investigate criminal behavior. See *Terry v. Ohio*, 392 U. S. 1, supra. Corporal Hood articulates no such grounds in the case sub judice. *His testimony reveals that defendant's only transgression was his presence in a car with a cracked windshield which was traversing the wrong parking lot, at the wrong time.* Under these circumstances, we find Corporal Hood's desire to include defendant's name and date of birth in his "little notebook pad" outside the scope of his "official" police duties. While keeping a "little notebook pad" of suspects may be good police practice, the collection of such information — as a matter of police routine unsupported by articulable suspicion of criminal activity — cannot be constitutionally justified. And in so holding, we are mindful of the recent decision in *Maryland v. Wilson*, 519 U. S. ___ (117 SC 882, 137 LE2d 41) (1997), where the United States Supreme Court held that a law enforcement officer may, as a matter of personal safety, order passengers out of a lawfully stopped vehicle. The case sub judice is distinguishable from *Wilson* because the arresting officer's exit-order in *Wilson* was a *Terry*-type command which the Supreme Court justified on the ground of officer safety, and Corporal Hood's interrogation of defendant in the case sub judice was a *Terry*-type encounter which the State alleges is justified on the ground of prevention or detection of crime.

Because Corporal Hood could not articulate a particularized reason for questioning defendant — other than his sense that defendant was "making kind of furtive movements like [he was] nervous about something . . ." — and because the corporal admitted he had no basis for believing that defendant had engaged in, was engaging in, or was about to engage in criminal activity, Corporal Hood was not lawfully discharging his "official duties" when he questioned defendant. Defendant therefore did not obstruct an officer in violation of OCGA § 16-10-25, and his conviction must therefore be reversed.

*Judgment reversed. Ruffin and Eldridge, JJ., concur and concur specially. Senior Appellate Judge Harold R. Banke concurs specially. Andrews, C. J., Birdsong, P. J., and Smith, J., dissent.*

RUFFIN, Judge, concurring and concurring specially.

I concur with all that is said in the majority opinion. Although Officer Hood was authorized to stop the car for the broken wind-

shield, the "furtive" movements of the two passengers were insufficient to authorize further questioning.

I note initially, that while I agree with most of what is said in Senior Appellate Judge Banke's concurring opinion, I believe his attention to the inconsistencies in Officer Hood's testimony disregards the applicable standard of review. On appeal from a motion to suppress, the evidence is viewed in a light most favorable to upholding the trial court's judgment and " '(t)he credibility of the witnesses and the weight to be accorded their testimony rest with the trier of fact, who is under no obligation to believe a witness, even in the absence of contradictory testimony.' " (Citation omitted.) *Anderson v. State*, 267 Ga. 116, 118 (2) (475 SE2d 629) (1996); *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994). Any inconsistencies in Officer Hood's testimony presented issues of fact which were properly resolved by the trial court. See *Anderson*, supra; see also *Gilbert v. State*, 222 Ga. App. 787 (2) (476 SE2d 39) (1996). Even viewing Officer Hood's testimony in this light, however, the evidence still shows that the trial court erred in denying Holt's motion to suppress.

As the majority observes, Officer Hood was authorized to stop the vehicle due to the broken windshield. See OCGA § 40-8-73 (e) (it is unlawful to operate a vehicle with a windshield that has "a starburst or spider webbing effect greater than three inches by three inches"). Assuming without deciding that Officer Hood had a reasonable suspicion sufficient to authorize him to question the driver about other possible criminal activity relating to car break-ins (see *Brisbane v. State*, 233 Ga. 339 (211 SE2d 294) (1974) (reasonable suspicion authorized by early morning observation of vehicle twice driving slowly by service station which had been the scene of several recent armed robberies)), his questioning and further detention of Holt were unreasonable under the circumstances and therefore prohibited by the Fourth Amendment.

"Reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last *no longer than is necessary* to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the *least* intrusive means reasonably available to *verify or dispel the officer's suspicion* in a short period of time." (Citations and punctuation omitted; emphasis supplied.) *Roberts v. State*, 193 Ga. App. 96, 98 (386 SE2d 921) (1989), citing *Terry v. Ohio*, 392 U. S. 1, 21 (88 SC 1868, 20 LE2d 889) (1968).

In this case, Officer Hood's testimony shows that his suspicion that Holt was in the parking lot to pursue criminal activity was dis-

pelled prior to asking Holt for his name. Specifically, Officer Hood testified: "I don't believe I asked [the passengers] what they were doing because the driver said [they] were looking for a job. . . . The way he told me, I just took it that they were all out looking for a job after he told me that."

The foregoing testimony unequivocally shows that Officer Hood's initial suspicions of criminal activity were quelled by the driver's answers prior to asking Holt *any* questions. Accordingly, any further detention of Holt was unnecessary, and the additional questioning of Holt was more intrusive than necessary to allay Officer Hood's suspicion. In addition, although Officer Hood did not observe Holt's nervous behavior until after the driver provided the explanation of their presence in the parking lot, the above testimony shows that Hood continued to believe the explanation even after observing the "furtive" actions. According to Officer Hood's testimony, that is why he never independently asked Holt what he was doing in the parking lot.

Upon determining that Holt's presence in the parking lot was not related to any criminal conduct, Officer Hood was not justified in continuing his investigation based solely on Holt's "furtive" conduct. "Furtive" gestures are generally defined as those which are secret or surreptitious. See Webster's Third New International Dictionary, p. 924 (1993). Although such gestures, in combination with other suspicious conduct, may be sufficient to create a reasonable suspicion of criminal activity, mere presence in a parking lot is insufficient. See *United States v. Thompson*, 712 F2d 1356, 1361 (11th Cir. 1983); *Rogers v. State*, 206 Ga. App. 654, 658 (3) (426 SE2d 209) (1992).

Finally, Officer Hood's stated reasons for asking Holt for his name and date of birth were not limited to the purported purpose of the investigative stop. Officer Hood testified that he asked the questions "to see if they were wanted, and also so [he] could have their names on file, in case we had some more entering autos in the area." It is unclear how either of these objectives could lead to a determination of whether Holt was, at the time of the stop, involved in criminal activity. See *Roberts*, supra. Indeed, the law clearly proscribes investigative stops for such arbitrary and harassing purposes. See generally *Givens v. State*, 218 Ga. App. 415, 416 (1) (461 SE2d 579) (1995) (basis of stop must be one from which court can determine that detention was not arbitrary or harassing).

After dispelling his suspicion that criminal activity was afoot, Officer Hood should have allowed Holt and his companions to go about their business. Although the continued detention and questioning might be perceived as minimal, it was an unreasonable and unnecessary intrusion and greater than the Fourth Amendment permits.

I am authorized to state that Judge Eldridge joins in this special concurrence.

Judge Harold R. Banke, concurring specially.

I fully concur in the majority's finding that the officer violated Holt's Fourth Amendment rights by detaining and questioning him in the absence of specific and articulable facts which would justify the intrusion. *Terry v. Ohio*, 392 U. S. 1, 21 (88 SC 1868, 20 LE2d 889) (1968). The dissent overlooks the clear differences between this case and the controlling authority on the parameters of articulable suspicion, the constitutional standard which must be satisfied before legally stopping an individual under the instant circumstances. *Terry v. Ohio*, 392 U. S. at 21.

In this case, the defendant was one of three black men in a car that had driven once around a Gwinnett County business center parking lot at about 10:30 a.m. Because the windshield was broken the officer had a justifiable reason for stopping the car. However, the only articulated reasons the officer had for questioning defendant, a passenger, were (1) the defendant was "making kind of furtive movements like [he] was nervous" and "fidgety" and (2) one car in the lot had been broken into over the weekend.[2] The officer admitted he had no description of the perpetrator of that crime and had no evidence to link the defendant with it. In fact, when asked what indicated to him that the car's occupants might have committed a crime, the officer testified, "Nothing indicated to me that they might have, other than they might have done it." The officer's response when asked how he connected the car's occupants with the weekend break-in was, "I didn't connect them with that."

The controlling cases require substantially more evidence to satisfy the articulable suspicion standard. In *Terry v. Ohio*, the defendants were obviously "casing" a store. They each walked in front of it, looked in, and walked back to a nearby corner five or six times. They interrupted this ritual to converse with a third man and eventually followed him down a path he had taken earlier. After watching for over ten minutes, the officer was thoroughly suspicious, and when the men stopped in front of the store again, he asked them their names. *Terry*, 392 U. S. at 6-7. The activity described in *Terry* clearly

---

[2] In his report, which was written "right after" arrest, the officer noted there had been "*an* entering auto over the weekend," which was his stated reason for seeking the identities of all the car's occupants. Months later at trial, the officer tentatively inflated that count, testifying that some officers told him "that there was some entering autos either that Sunday or Monday in the Pinnacle Center Business Park. . . ." During cross-examination, the officer also tentatively inflated his initial testimony that the vehicle he stopped "drove around that parking lot once," asserting that "they rode around that parking lot one or two times, I can't remember."

was more than mere "fidgeting."

*Williams v. State*, 163 Ga. App. 866, 868 (2) (295 SE2d 361) (1982), is likewise distinguishable. In that case, a drugstore received a bomb threat around 2:00 in the morning from a caller who sounded like a white male. Around 4:00 a.m., after several more calls threatening to detonate the bomb by remote control if certain drugs were not delivered to a designated drop point, the druggist and a police officer looked out the window into the deserted parking lot and spotted a car. Its white male driver proceeded very slowly across the lot, more or less stopped in front of the store, looked through the window and saw the officer, and left. Police stopped the car and recognized the driver's voice from the calls making bomb threats.

The many salient differences between the instant case and *Williams* include the fact that the officer there was immersed in investigating and preventing a serious, potentially life-threatening offense in progress at the time of the stop. The setting, in the middle of the night in a totally deserted parking lot, instead of during the lunch hour in a crowded lot, helped the officer in *Williams* focus on the suspect. The officer in *Williams* had reason to believe a white male had made the threatening calls, unlike the officer in the instant case who admitted he had no description of the perpetrator of the weekend auto break-in. The defendant in *Williams* matched the description of the perpetrator and created reasonable suspicion by looking into the store, spying the officer, and leaving, acts not so different from the defendants in *Terry*. In our case, the officer articulated no facts linking Holt to the break-in. The officer did not even report that the defendant looked at the cars while completing his single circle around the lot. The only evidence supporting the officer's action was that Holt looked "furtive" and "nervous" and "fidgeted." Given the fact that Holt's arrest occurred in a parking lot on a mid-June day nearly 30 minutes after the officer stopped the car, the cause of Holt's discomfort need not be attributed to culpable thoughts.

I concur as well because the last line of the opinion makes it appear as though obstruction may be an additional element of the crime charged. Obstruction is not an element of OCGA § 16-10-25 (giving a false name to an officer).

SMITH, Judge, dissenting.

I respectfully dissent. "An authorized officer may stop an automobile and conduct a limited investigative inquiry of its occupants, without probable cause, if he has reasonable grounds for such action; a founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to

arrest simply to shrug his shoulders and allow a crime to occur or a criminal to escape." (Citation omitted.) *Williams v. State*, 163 Ga. App. 866, 868 (2) (295 SE2d 361) (1982).

The facts observed by this officer are similar to those in *Williams*, and indeed to those in the seminal case of *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968).[3] In an isolated area of an office park which had suffered "some entering autos" over the past two days, a police officer observed a car with three occupants circling "one or two times" through two different parking lots at a very slow rate of speed, passing empty parking spaces close to the office buildings. When the officer stopped them, the driver gave inconsistent explanations for their presence and the passengers appeared "furtive" and "nervous."

Under these circumstances, the officer was certainly justified in his suspicion that the occupants of the vehicle were "scoping out" the parked cars, and he was in the lawful discharge of his official duties in questioning Holt "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." *Williams*, supra, 163 Ga. App. at 868 (2). How the officer chose to record any information he obtained is irrelevant to whether he had an articulable suspicion sufficient to justify the stop and limited questioning.

For this reason, I respectfully dissent.

I am authorized to state that Chief Judge Andrews and Presiding Judge Birdsong join in this dissent.

DECIDED JUNE 5, 1997 —
RECONSIDERATION DENIED JUNE 25, 1997.

*Clark & Towne, David E. Clark*, for appellant.
*Gerald N. Blaney, Jr., Solicitor, Scott A. Drake, Richard E. Thomas, Assistant Solicitors*, for appellee.

---

[3] While committing no obvious crime, the defendants in *Terry* were slowly and repeatedly passing a location and appeared to be "casing a job." 392 U. S. at 6. The defendant in *Williams* drove slowly past a location that had been the subject of telephoned threats and appeared to act furtively after he saw a police officer. 163 Ga. App. at 868.