## S05A0664. RAMIREZ v. THE STATE.

(619 SE2d 668)

THOMPSON, Justice.

Appellant Bautista Ramirez shot and killed Officer Hugo Arango, a City of Doraville peace officer, at the Eclipse nightclub in DeKalb County, and gravely wounded the club's manager, David Contreras. Ramirez was convicted of felony murder, aggravated battery, and other offenses in connection with the crimes.[1] On appeal, Ramirez claims that the trial court erred in failing to give certain requested jury instructions and he challenges several rulings by the trial court during voir dire and at trial. Finding no reversible error, we affirm.

Viewed in a light most favorable to the verdict, the evidence shows that at about midnight, Ramirez, along with his cousin Alvaro Ramirez ("Alvaro") and a friend known as Angel drove to the Eclipse

---

[1] The crimes occurred on May 13, 2000. An indictment was returned on June 22, 2000, charging Ramirez with malice murder; felony murder while in the commission of an aggravated assault on a peace officer; aggravated assault (two counts); aggravated battery (two counts); and carrying a concealed weapon. The State served notice of its intent to seek the death penalty. Interim review was granted by this Court. *Ramirez v. State*, 276 Ga. 158 (575 SE2d 462) (2003). Trial commenced on April 21, 2003. On June 25, 2003, a jury acquitted Ramirez of malice murder, and convicted him of all remaining counts. Following a sentencing hearing, the jury found the existence of two statutory aggravating circumstances and fixed the sentence at life imprisonment. The aggravated assault counts and one count of aggravated battery were merged for purposes of sentencing, and Ramirez was sentenced on June 25, 2003 to life imprisonment plus consecutive terms of 20 years. A timely motion for new trial was filed. The motion as amended was denied on November 9, 2004. A notice of appeal was filed on November 29, 2004, and the case was docketed in this Court on December 22, 2004. Oral argument was heard on April 11, 2005.

nightclub in Angel's Mercury Cougar automobile. Angel entered the nightclub while Ramirez and Alvaro remained with the vehicle in the parking lot. Alvaro was seated in the driver's seat with the driver's door open, and his head resting on the steering column. Ramirez exited the car but remained nearby walking around the parking lot.

About ten minutes later, David Contreras and Officer Arango were standing outside the entrance to the Eclipse. Officer Arango was in uniform, and Contreras was wearing an orange vest over his shirt which identified him as "security" for the Eclipse; he was unarmed. The two men were approached by a female customer who informed them that there were individuals attempting to break into cars in the parking lot. In response, Officer Arango got into his marked patrol car and drove through the parking lot. At that point, Ramirez, who was on foot in the parking lot, spotted the patrol car approaching. Ramirez was carrying a nine-millimeter semiautomatic pistol in the waistband of his pants. He knew that he had to dispose of the gun because by his own admission, he was in the United States illegally and had no permit for the weapon. He attempted to get into the back seat of the Cougar to conceal the weapon just as the officer exited his patrol car and approached the Cougar. Alvaro remained in the driver's seat. Ramirez was able to get halfway inside the car when the officer asked the two to identify the owner of the vehicle; Ramirez replied that it belonged to a friend. The officer asked both men to get out of the car. When Alvaro did not do as instructed, the officer shouted the instructions again; both men finally exited the Cougar and were instructed to place their hands on the hood of the car. While holding a small metal flashlight in the crook of his neck, the officer proceeded to conduct a pat-down search of Alvaro. The officer removed a wallet from Alvaro's back pocket and placed it on the hood of the car between the two men. Upon concluding the pat-down of Alvaro, the officer turned his attention to Ramirez. At that point, Alvaro removed his hands from the hood of the car. In an authoritative tone, the officer told him to assume his former position; Alvaro did so. The officer then proceeded to pat-down Ramirez, removing a wallet from Ramirez's back pocket and placing it alongside Alvaro's wallet on the hood. As the officer continued the pat-down search, he felt what turned out to be a pager in Ramirez's right front pocket, whereupon the officer pulled Ramirez's shirt up above his navel. The butt of a pistol could be seen protruding from Ramirez's waistband. According to both Ramirez and Alvaro, the officer saw the gun and grabbed for it while standing behind Ramirez. Ramirez immediately turned and began to run. He took only a few steps when the officer caught up with him, struck him once in the back of the head with the flashlight, and then grabbed him from behind. Both men fell to the ground, grappling for the gun. Ramirez drew the gun with his right hand, cocked it, and

fired a shot into the air. The unarmed Contreras was standing nearby, and he attempted to assist Officer Arango by reaching for Ramirez's gun. In response, Ramirez pointed the gun at Contreras and fired three or four shots, striking Contreras in the face, and blinding him in one eye. While still lying on the ground, Ramirez aimed the gun under his left arm and fired two more shots in the direction of the officer. Officer Arango was injured and he remained motionless on the ground. Ramirez got up and went toward the Cougar, but first fired two more shots at the disabled officer at close range.[2] The officer had not drawn his service revolver nor any other weapon from his utility belt. Ramirez told Alvaro to get into the car and the two drove away, leaving their wallets on the hood. Ramirez's wallet containing identifying information was retrieved from the parking lot.

The forensic evidence established that Ramirez fired a shot into Officer Arango's left thigh from a distance of three to four inches, incapacitating him. Ramirez fired another bullet into the officer's chest while holding the muzzle of the weapon in direct contact with the officer. That bullet pierced a finger of the officer's right hand which was positioned over the chest, traveled through his badge, and lodged in his protective chest armor. Neither of those injuries was life-threatening. A fatal shot was fired through the officer's head from a distance of nine to twelve inches, severing his brain stem and killing him almost instantly.

Ramirez and Alvaro eluded the police for several days. During that time, Ramirez told Alvaro that he shot the officer because "he didn't like the way the officer spoke" to Alvaro, and because "he didn't want to go back to jail." Ramirez was apprehended five days later while hiding in a wooded area in Cherokee County. The murder weapon, a nine-millimeter Smith and Wesson semiautomatic revolver, was recovered in the area of the arrest.

1. Ramirez submits that the trial court erred in denying his motion for directed verdict of acquittal with respect to the offense of felony murder. His claim is premised on the assertion that the State failed to prove the underlying felony of aggravated assault on a peace officer because Officer Arango was not acting within the lawful exercise of his official duties when he stopped and questioned Ramirez and Alvaro.[3] This contention is wholly without merit. The totality of the circumstances (e.g., the information provided by the club patron to Officer Arango that men were breaking into cars in the parking lot,

---

[2] The evidence established that Ramirez's pistol held 14 bullets.

[3] Under OCGA § 16-5-21 (a), (c), a person commits the offense of aggravated assault upon a peace officer when the person knowingly assaults a peace officer "while the peace officer is engaged in, or on account of the performance of, his or her official duties."

Ramirez's conduct in walking around the parking lot and his attempt to get into the Cougar upon being approached by the officer, his admission that the vehicle was not his, Alvaro's conduct in the vehicle as well as his initial refusal to obey the officer's instructions) provided the officer with a "particularized and objective basis for suspecting the particular person[s] stopped of criminal activity." *United States v. Cortez*, 449 U. S. 411, 418 (101 SC 690, 66 LE2d 621) (1981). Thus, we conclude that Officer Arango was discharging a legitimate investigative function when he approached Ramirez and Alvaro to conduct a protective search for weapons.[4] *Terry v. Ohio*, 392 U. S. 1 (III) (88 SC 1868, 20 LE2d 889) (1968). See also *Thomason v. State*, 268 Ga. 298 (2) (486 SE2d 861) (1997). It follows that the evidence was sufficient to find Ramirez guilty of felony murder and that the trial court did not err in denying Ramirez's motion for directed verdict of acquittal as to that offense. See *Bundren v. State*, 247 Ga. 180 (2) (274 SE2d 455) (1981); *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). Compare *Holt v. State*, 227 Ga. App. 46 (487 SE2d 629) (1997) (officer who questioned defendant without a particularized reason therefor was not lawfully discharging his "official duties").

2. The evidence was sufficient for a rational trier of fact to have found Ramirez guilty beyond a reasonable doubt of all the crimes for which he was convicted. *Jackson v. Virginia*, supra.

3. Ramirez asserts that the trial court erred in failing to excuse two jurors for cause.

The questionnaire sent to prospective jurors in this case included two questions about their familiarity with the Club Eclipse. During voir dire juror 36 disclosed that after receiving the jury summons and questionnaire, he conducted a computer search of the Club Eclipse, which led him to articles in the Atlanta Journal Constitution about the shooting. Defense counsel questioned the juror extensively about whether the information in those articles would affect his decision as a juror. He replied that he was "not convinced" about the truthfulness of the information contained in the articles and that he would consider the evidence adduced at trial. That juror also disclosed that his brother is a former district attorney and now a judge in another judicial circuit.

Juror 40 expressed a belief that occasionally police either manufacture or plant evidence to secure a conviction. Also, the juror was of the belief that the guilty lie to avoid conviction. The juror, however, stated that she would put aside her beliefs, listen to the testimony, and that her evaluation of the evidence would not be affected by her beliefs.

---

[4] The jury also made that determination upon proper instructions from the court.

"It is not isolated responses, but the 'final distillation' of a prospective juror's voir dire which determines whether a juror is qualified to serve." *Raulerson v. State*, 268 Ga. 623, 629 (3) (491 SE2d 791) (1997). In order to strike a juror for cause, the juror's opinion must be "so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence and the court's instructions." *Head v. State*, 276 Ga. 131, 133 (2) (575 SE2d 883) (2003). Juror 36 testified that he could impartially decide the guilt or innocence of defendant and that his relationship with his brother would not affect his ability to be impartial. And "[t]he fact that a juror has expressed a belief in the credibility of police officers does not require that [the juror] be excused for cause." *Roberts v. State*, 276 Ga. 258, 259 (2) (577 SE2d 580) (2003). Nor does a juror's pretrial exposure to media coverage of a crime mandate that the juror be excused for cause where, as here, the juror expresses the ability to "set aside anything they had heard or seen and base their personal verdicts only on the evidence presented in the courtroom." *Lawler v. State*, 276 Ga. 229, 235 (5) (576 SE2d 841) (2003).

The trial court determined that neither juror's opinions were so fixed or definite that they would not be changed by the evidence or the charge of the court. See *Head*, supra. Thus, the court did not abuse its discretion in refusing to disqualify these jurors for cause. Id.

4. Ramirez contends that the trial court erred in restricting defense counsel's voir dire questions regarding attitudes about self-defense in response to the actions of a police officer. Following the State's objection to the phrasing of a particular question, defendant's own counsel proposed a question pertaining to a juror's consideration of a citizen's justification in responding with force against a police officer. The State had no objection to the question as rephrased, and the trial court allowed it. Ramirez asserted no further objection.

> Although OCGA § 15-12-133 . . . outlines the permissible scope of voir dire, the line of demarcation between those questions which fall within the scope of § 15-12-133 . . . and those questions which are beyond the scope of this statute is not always crystal clear. [Cit.] Therefore, it has been held that the control of voir-dire examination is vested in the sound legal discretion of the trial judge.

*Carter v. State*, 252 Ga. 502, 507 (9) (315 SE2d 646) (1984). We find no abuse of that discretion. Id.

5. Similarly, Ramirez claims that defense counsel was unduly restricted in attempting to inquire into attitudes about racial bias during voir dire.

Defense counsel attempted to ask potential jurors whether the juror "had occasion to hear any derogatory statements made about another race in [their] presence" or whether the juror had ever used a derogatory term with regard to someone of another race. The trial court sustained the State's objections to these questions. After hearing argument on this issue outside the presence of the prospective jurors, the trial court reconsidered and allowed inquiry as to whether a juror had heard or made racial remarks. If the answer was affirmative, the defense was allowed to ask if the juror's racial beliefs would make it impossible to be an impartial juror. Ramirez points to no other portion of the voir dire in which his examination of prospective jurors on the issue of racial bias was unduly restricted.

> The single purpose for voir dire is the ascertainment of the impartiality of jurors, their ability to treat the cause on the merits with objectivity and freedom from bias and prior inclination. The control of the pursuit of such determination is within the sound legal discretion of the trial court, and only in the event of manifest abuse will it be upset upon review.

*Robles v. State,* 277 Ga. 415, 419 (3) (589 SE2d 566) (2003). Under the circumstances, we are confident that defendant "had a fair and adequate opportunity during voir dire to explore the prospective jurors' possible racial bias," *Walker v. State,* 214 Ga. App. 777, 779 (3) (449 SE2d 322) (1994), and the trial court's ruling did not amount to an abuse of discretion.

6. Ramirez asserts that the trial court erred in denying a pretrial motion to suppress his wallet based on the court's finding that the wallet had been voluntarily abandoned. He argues that the wallet was illegally seized prior to his flight; therefore, there could be no abandonment.

Assuming without deciding that the officer acquired the wallet as the result of an unlawful seizure, we nevertheless affirm the trial court's denial of the motion to suppress because any error in that ruling was harmless beyond a reasonable doubt. Following the shootings, Ramirez and Alvaro fled in the Mercury Cougar automobile, leaving their wallets on the hood of the car. Ramirez's wallet fell to the ground in the parking lot and was retrieved by officers investigating the scene. It contained several identification cards bearing the name Bautista Ramirez, and showing various addresses in Roswell and Canton, Georgia, as well as two traffic citations issued to Ramirez along with an impound inventory sheet referencing a 1994 Ford automobile. Thus, the contents of the wallet at best served to identify Ramirez as a perpetrator. However, identity was not an

issue at trial; the defense was justification. It was shown that within days of the shooting, Alvaro identified Ramirez as the shooter, disclosed Ramirez's whereabouts, and otherwise cooperated with the investigation. After his arrest, Ramirez gave a custodial statement admitting his participation in the crime but claiming justification; he also testified at trial, asserting the same defense.

Even assuming arguendo that the denial of the motion to suppress was improper, we find no reasonable possibility that the evidence may have contributed to the verdict; therefore, any resulting error was harmless beyond a reasonable doubt. *Schneble v. Florida*, 405 U. S. 427 (92 SC 1056, 31 LE2d 340) (1972); *Mullins v. State*, 258 Ga. 734 (2) (374 SE2d 530) (1988); *Nealey v. State*, 233 Ga. 326 (211 SE2d 286) (1974); *Arnold v. State*, 237 Ga. App. 857, 859 (2) (517 SE2d 97) (1999).

7. Under Article 36 of the Vienna Convention on Consular Relations, 21 U.S.T. 77, a foreign national of a signatory country who is arrested in a signatory country must be advised "without delay" that he has a right to have his nation's consul informed of the arrest and to consult with his consul. Ramirez, a Mexican national, moved to suppress his custodial statement as given in violation of the Vienna Convention. Evidence showed that Ramirez was arrested and was not told of his rights under the Convention until after his custodial statement had been given.

Ramirez is not entitled to suppression of his statement based upon the Vienna Convention.

> [I]t is clear that nothing in the text [of the Vienna Convention] requires suppression of evidence or dismissal of the indictment for violations. [Cit.] Because by its terms the Vienna Convention does not require application of the exclusionary rule or the more drastic remedy of dismissal of the indictment, we cannot impose such judicially created remedies absent a violation of a constitutional right. . . . We find that the rights, if any, created by the Vienna Convention do not rise to the level of a constitutional right protected by the judicially created remedies sought by [Ramirez].

*Villegas v. State*, 273 Ga. 824, 826-827 (6) (546 SE2d 504) (2001).[5] Moreover, in this case an instruction was given to the jury that would

---

[5] Defendant relies on *Delaware v. Reyes*, 740 A2d 7 (Del. Super. 1999), in which the Delaware superior court reached a contrary conclusion. However, that case has been widely criticized and finally disapproved by the same court in *State v. Vasquez*, 2001 WL 755930 (Del. Super. May 23, 2001) (unpublished opinion).

allow it to consider the mandate of the Convention in order to assess the voluntariness of the statement.

8. Nor do we find any infirmity in the manner in which *Miranda* warnings were administered. Ramirez was advised of his *Miranda* rights on two occasions prior to giving his custodial statement. The simple fact that there may have been some inconsistency in the exact form of the various warnings does not establish that the statement was involuntary. See *Duckworth v. Eagan*, 492 U. S. 195 (109 SC 2875, 106 LE2d 166) (1989); *Osborne v. State*, 263 Ga. 214 (4) (430 SE2d 576) (1993).

9. Ramirez asserts that the trial court erred by failing to grant a mistrial or giving an instruction to disregard when on two occasions, State's witnesses referred to "gangs." The first reference was made by an investigative officer who testified that his expertise was as a "gang investigator." The defense argued that the reference was prejudicial and contrary to a previous ruling by the trial court to disallow any evidence of gang affiliation. The trial court denied defendant's motion for mistrial but instructed the jury to disregard the mention of gang activity. The second instance occurred when the club manager stated that a patron informed him that "gangs or gang members" were involved in the alleged break-ins. Defense counsel objected and moved for mistrial asserting bad faith on the part of the State. Ramirez's motion for mistrial was again denied and the jury was instructed that there was no evidence that Ramirez was a member of, or connected with, a gang.

We conclude that in both instances, the trial court provided adequate curative instructions and thus, there was no error in denying Ramirez's motions for mistrial. The references to gangs were only in passing and did not implicate Ramirez in gang activity. Considering " 'the nature of the statement, the other evidence in the case, and the action taken by the court and counsel concerning the impropriety,' " *Gardner v. State*, 273 Ga. 809, 813 (5) (546 SE2d 490) (2001), we find no abuse of discretion in the denial of Ramirez's motion for mistrial. See generally *Olarte v. State*, 273 Ga. App. 96 (2) (c) (614 SE2d 213) (2005). Compare *Hartry v. State*, 270 Ga. 596 (2) (512 SE2d 251) (1999) and *Alexander v. State*, 270 Ga. 346 (2) (509 SE2d 56) (1998) (trial court abused its discretion in denying motion for mistrial where prosecution represented during opening argument that it would introduce evidence that the crime was gang-related, but failed to offer such evidence at trial, proffered no good faith explanation for his argument, and no specific curative instructions were given to the jury).

10. Ramirez submits that the trial court erred in refusing to give certain requested jury instructions to the effect that: (a) a law

enforcement officer may not use deadly force to stop a fleeing misdemeanant; (b) carrying a concealed weapon is a misdemeanor; and (c) fleeing a search is only misdemeanor obstruction.

In addition to a complete charge on justification and the definition of forcible felony, the trial court charged the jury on the three levels of police-citizen encounters, including instructions that the State had the burden to prove the lawfulness of the stop, that a police officer is not performing his official duties when he attempts to detain an individual without a particularized and objective basis for suspecting criminal activity, and that a jury must decide which type of encounter occurred and whether the officer had a legal basis to question, stop, or arrest defendant. Additionally, the trial court instructed that a peace officer in making a lawful detention or arrest, is authorized to use only that degree of force that is reasonably necessary to accomplish the detention or arrest, and may not use excessive force; and that a person subject to lawful detention or arrest has the right to resist the use of excessive force to the degree the person reasonably believes that the degree of resistance used is necessary to defend against unlawful force. Thus, the charge as a whole properly covered the applicable principles of law. See *Pittman v. State*, 273 Ga. 849 (4) (546 SE2d 277) (2001). Accordingly, we find no error in the refusal to give the requested charges. Id.

Likewise, the trial court did not err in refusing to charge the jury in language drawn from *Mullis v. State*, 196 Ga. 569 (27 SE2d 91) (1943), to the effect that an officer cannot use deadly force against a fleeing misdemeanant. Because the pattern jury charge accurately stated the applicable principles of Georgia law, the rejection of defendant's proposed *Mullis* charge was not error. *Pittman*, supra.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 19, 2005.

*Willis & Quinn, William G. Quinn III*, for appellant.

*Gwendolyn Keyes Fleming, District Attorney, Robert M. Coker, James M. McDaniel, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Chad E. Jacobs, Assistant Attorney General*, for appellee.