## A11A0343. KEATING v. THE STATE.
### (711 SE2d 327)

ADAMS, Judge.

Convicted of conspiracy to commit armed robbery, Maya Keating, age fourteen at the time of the incident during which one man was shot and killed, contends that three errors occurred at her trial requiring reversal. We disagree and affirm.

Five other individuals were involved in the crimes; Christina Pascarella's conviction has already been affirmed by this Court. An overview of the facts, supplemented here by the transcript, is found in that opinion:

> Viewed in the light most favorable to the conviction, the evidence showed that on April 21, 2006, [Christina] Pascarella [and Maya Keating] accompanied several other persons to a restaurant in a car. [Pascarella] and [Keating] entered the restaurant and purchased drinks. They then returned to the car and reported to their companions the number of people inside the restaurant. While Pascarella [and Keating] remained outside, two of [their] companions [Robert "Rocky" Watkins and Colton "C. O." Williams ("Colton")] entered the back of the restaurant, brandished firearms, and demanded money. Two people inside the restaurant were shot, one of whom died.

*Pascarella v. State*, 294 Ga. App. 414 (669 SE2d 216) (2008). Watkins was convicted of murder for being the shooter. Like Pascarella,

Keating was indicted on seven charges, including three counts of murder, conspiracy to commit armed robbery, two counts of aggravated assault, and possession of a firearm during the commission of a crime. Like Pascarella, she was acquitted of all charges except the conspiracy charge; she was sentenced to ten years.

1. Keating contends the trial court erred by denying her motion in limine seeking to exclude statements made by her co-conspirator Pascarella. She contends Pascarella's statements are inadmissible hearsay, that any conspiracy had ended by the time the statements were made, and that, therefore, the statements were not admissible under OCGA § 24-3-5.

"Hearsay statements made by a conspirator during the course of a conspiracy, including the concealment phase, are admissible against all conspirators." (Citation and punctuation omitted.) *Brooks v. State*, 281 Ga. 14, 16 (2) (635 SE2d 723) (2006). See also OCGA § 24-3-5.[1] The key question is whether the conspiracy was still in the concealment phase given that at the time of the statements, Pascarella had not been arrested but the others had, and several had given statements. *Brooks* explains some aspects of the rule:

> Merely because the defendants were talking about the crimes to third parties does not evidence the end of the concealment of the conspiracy. Moreover, a conspiracy or the concealment phase of it does not end just because one or more participants have been arrested and jailed.

Id. The Supreme Court has held that where one co-defendant has terminated his participation in the conspiracy but two others have not, statements made by one of the other two are still admissible against the third under this rule. *Bundrage v. State*, 265 Ga. 813 (2) (462 SE2d 719) (1995). In *Bundrage*, one of three co-defendants may have terminated his participation in the conspiracy by giving the police a statement or assisting the police by calling the second defendant. Id. Even so, the second defendant's statements made during that call implicating the third defendant were admissible as being part of the conspiracy because the second defendant was still conspiring to conceal the crime. Id. at 814 (2).

Here the facts show that a conspiracy to engage in criminal activity existed between the six youths and that, at the time Pascarella made her statements to her friends Brianna Williams ("Brianna") and Heather Martin, she had not confessed to the police

---

[1] See also *Allen v. State*, 288 Ga. 263, 267 (4) (702 SE2d 869) (2010) (such statements do not violate the Confrontation Clause under *Crawford v. Washington*, 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004), because they are not testimonial).

or been arrested. Furthermore, she told her friends different versions of why she went into the restaurant, thereby concealing her own role. And at the same time, she was receiving messages from Watkins in jail asking her to alter aspects of the story to minimize his role in the incident in exchange for him keeping her role to a minimum, even though she apparently refused to agree to do so. The conspiracy did not end "when some of the conspirators were arrested and made inculpatory statements, because the conspiracy to conceal the identity of the remaining perpetrators was ongoing." *Ottis v. State*, 269 Ga. 151, 155 (3) (496 SE2d 264) (1998). And as late as June 2006, over a month after Pascarella made her statements, Watkins was still sending her messages in which he instructed her and Keating to "just play stupid and act like you don't know shit." The trial court therefore did not abuse its discretion by allowing the statements made by Pascarella into evidence against Keating. See *English v. State*, 288 Ga. App. 436, 441 (2) (654 SE2d 150) (2007) (abuse of discretion).

2. Keating contends the trial court improperly restricted questioning during voir dire related to the possible racial bias, prejudice, or leaning of prospective jurors. Most of the defendants were black and the victims were of Asian and Latino descent. We review this enumeration for abuse of discretion. *Curry v. State*, 255 Ga. 215, 218 (2) (b) (336 SE2d 762) (1985).

Georgia law provides that counsel have the right to examine jurors regarding anything that would show interest by a juror in the case:

> In the examination, the counsel for either party *shall have the right* to inquire of the individual jurors examined touching any matter or thing which would illustrate any interest of the juror in the case, including any opinion as to which party ought to prevail, the relationship or acquaintance of the juror with the parties or counsel therefor, any fact or circumstance indicating any inclination, leaning, or bias which the juror might have respecting the subject matter of the action or the counsel or parties thereto, and the religious, social, and fraternal connections of the juror.

(Emphasis supplied.) OCGA § 15-12-133. Thus the defendant in a criminal case "has an absolute right to have his prospective jurors questioned as to those matters specified in OCGA § 15-12-133, . . . [which] encompasses questions regarding possible racial prejudice and bias." (Citations and punctuation omitted.) *Legare v. State*, 256 Ga. 302, 303-304 (1) (348 SE2d 881) (1986). Nevertheless, the court has discretion over the scope of permissible questions and how the

voir dire is conducted. *Ramirez v. State*, 279 Ga. 569, 573 (4) (619 SE2d 668) (2005). See also *Robles v. State*, 277 Ga. 415, 419 (3) (589 SE2d 566) (2003).

Here, the court did not allow defense counsel to question the jurors regarding possible racial prejudice and bias after their first attempt to do so; it essentially only allowed one general question on the topic, and the court itself asked most of the jurors that one question. The voir dire unfolded as follows: The defense attorneys for the several defendants elected one attorney to ask the general questions to each of four panels of prospective jurors. During voir dire of the first panel, defense counsel asked, "Do any of you feel that minorities are not treated fairly in the judicial system?" The State objected, and the court sustained the objection. Defense counsel then asked without objection, "Do any of you feel as though you might have any biases or prejudices at all towards minorities?" Defense counsel received another objection to the next question: "Do any of you feel that young black men are more prone to —." The court stated, "That's clearly an objectionable question. You are not going there."

After the first panel was excused, defense counsel argued that the court improperly limited the questioning. The court explained that defense counsel could ask whether the jurors had any biases or prejudices concerning race or against the defendants concerning race, but that was as far as they could go. Defense counsel also proposed asking, "Would you believe a white police officer over a black defendant," and the court refused to allow that question. The court stated that counsel could submit "deeper questions" for review before asking them of the jurors. The defendants prepared a list, but the court did not allow the defense to ask any of the questions.[2] Instead, during voir dire of the remaining panels, the court intervened in the questioning and asked this one question or its equivalent: "Do any of you jurors have any bias or prejudice, based on the age, race, religion, national origin of the accused?" The defense attorneys were allowed to ask follow up questions of anyone who

---

[2] Defense counsel submitted the following list of questions:

1. What civic organizations are you a member of? How many black members do you have[?]

2. How many black members of your church[?]

3. How many black people live in your neighborhood[?]

4. Have you, any member of your family, or anyone you know ever had any disagreements, arguments or confrontations with a black person[?]

5. How do you feel about racial slurs[?]

6. Would you be more likely to convict because a person is black[?]

7. Would you presume or [be] more likely to presume a person guilty because of race[?]

8. Are young black men more prone to commit crimes than young white men[?]

gave a positive response to the court's questions, which one juror did. The question raised is whether the trial court erred by taking over and asking only the single question, thereby preventing defense counsel from posing questions, included those submitted in writing.

Pretermitting whether the court erred, there is no reversible error if the State can carry its burden to show "that it is highly probable that the error did not contribute to the judgment." *Meeks v. State*, 269 Ga. App. 836, 841 (1) (605 SE2d 428) (2004) (abuse of the court's discretion regarding scope of voir dire not reversible error where no harm shown). See also *Henderson v. State*, 251 Ga. 398, 403 (2) (306 SE2d 645) (1983) (burden). To satisfy this standard, the State contends there is overwhelming evidence of Keating's guilt. See *Meeks*, 269 Ga. App. at 841 (1). We agree that the State has shown that it is highly probable that the error did not contribute to the judgment for several reasons.

Keating was convicted of conspiracy to commit armed robbery; she was acquitted on the counts of murder, aggravated assault, and possession of a weapon during the commission of a crime. The jury also acquitted Colton of the murder counts, despite his having been in the restaurant carrying a gun when the victim was killed. Thus, first and foremost, the jury's verdict indicates that they carefully considered the evidence against Keating and the other defendants count by count.

Second, the trial court did ask the jurors one appropriate question about their possible racial prejudice or bias. The question had some effect as one juror raised his hand, thereby exposing himself to follow up questions on that topic. Third, as shown at the hearing on the motion for new trial, three of the twelve jurors were African-American, and one of them was elected to be the foreperson.

Fourth, with one exception, the evidence supporting Keating's conviction was overwhelming. The evidence presented at trial is virtually undisputed that on Friday April 21, 2006, Keating, Watkins, Colton, Marcus Brown, Coleman, and Pascarella, riding together in one car late in the evening, first went to an apartment complex across the street from the restaurant and bought some illegal drugs.[3] The six young people next drove to the China Wok restaurant and parked. There were two guns in the car; Watkins said they were in plain view, and Brown said he could see one of them under the front passenger seat from his position in the back seat. In his statement to the police, Watkins said he needed money. Watkins asked Pascarella to go inside and count how many people were there, and Keating agreed to go with her and get a drink. One of the

---

[3] Coleman was tried separately.

restaurant's employees corroborated that two teenage girls came into the restaurant right before closing to buy just one drink. Pascarella and Keating were the only two girls in the car. The girls were not in the store very long, and they were the last customers that evening. The same witness testified that only a few minutes later, the gunshots began.

The girls came back out, reported how many people were in the restaurant, and waited in the car along with Brown and Coleman, while Watkins and Colton got out of the car and covered their faces; in Colton's case, he used a shirt that Brown had been wearing. Brown saw that Watkins had a gun before the two went into the restaurant. After they went in, those in the car heard two gunshots. Watkins and Colton came out, jumped in the car, and screamed to go. A security camera showed two men running into and out of the restaurant at that time. Watkins told the others that he thought he had killed someone, and he threatened to kill anyone and their family if anyone told what had happened.

The group then went to Keating's mother's apartment where Keating's bedroom was located; all six of them were there at 12:30 a.m. or 1:00 a.m., only an hour or two after the shooting, when Brianna arrived to see Keating and Watkins, who had invited her over earlier in the day. According to Brianna, all six were acting unusually quiet. Keating was also seen in her own bedroom on Sunday, two days later.

The police arrived at Keating's mother's apartment at 4:00 a.m. Monday and arrested Watkins, Keating, and Heather Martin, who was spending the night there. The officers searched the apartment at that time. The nine-millimeter gun that was used to kill the victim was found under Keating's mattress. In her room in a suitcase in the closet, officers found a sawed-off shotgun, several types of ammunition and four cell phones. On the top of the dresser, they found two black gloves, one of which contained a small .25 caliber semiautomatic pistol. Also on top of the dresser they found a loaded magazine for a semiautomatic rifle. In the top drawer of the dresser they found a holster and three knit hats. The nine-millimeter gun had been openly visible on the bed at one point on Sunday when Brianna was there visiting Keating. Thus, during the entire weekend, Keating knew of the use of guns during the incident Friday night, yet guns and ammunition, including the murder weapon, were in her bedroom, including ammunition in plain sight.

The only real conflict in the above-stated evidence regarding Keating's role was whether she knew going in that she and Pascarella were on a mission to count the number of people inside. Both Martin and Brianna testified that Pascarella told them that Watkins asked her to go in and count heads and that Keating agreed to go

with her and buy a drink. But Brianna also testified that Pascarella initially said that the two girls just went in to get a drink, suggesting that they did not know of a plan to rob the restaurant. But Brianna testified that Pascarella revised her story to include the counting-heads version.

"A person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy." OCGA § 16-4-8. A conspiracy may be established "by inference, as a deduction from acts and conduct, which discloses a common design on their part to act together for the accomplishment of the unlawful purpose." (Citations and punctuation omitted.) *Brooks*, 281 Ga. at 15 (2). Thus, the State need only show that "two or more persons tacitly came to a mutual understanding to accomplish or to pursue a criminal objective." (Footnote omitted.) *Williamson v. State*, 300 Ga. App. 538, 547 (5) (685 SE2d 784) (2009). And "[a]lthough mere presence at the scene of a crime is insufficient to convict a defendant of being a party to the crime, 'presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred.' [Cit.]" *Ford v. State*, 280 Ga. App. 580, 581 (634 SE2d 522) (2006).

Keating accompanied Pascarella into the restaurant to count heads, returned to the car, waited as Watkins and Colton masked themselves and went in, heard the shots, and did not leave or flee while Watkins and Colton were inside. Then, with knowledge that two companions had entered the restaurant, discharged weapons, and possibly killed someone, she allowed the entire party to come to her home and store the guns in her bedroom. For two days, she continued to conceal her participation in the crimes as well as the participation of others even though her mother was nearby. Thus the jury was well authorized to conclude that Keating was a part of the conspiracy to commit armed robbery.

Given that the jurors were at least asked one question about racial prejudice and bias, that the jury was one-quarter African-American, that the jury appears to have carefully considered the case count-by-count and defendant-by-defendant, and that the evidence strongly shows that Keating was a full participant in the conspiracy to rob the China Wok, we conclude that the State has carried its burden of showing that it is highly probable that any failure to allow the defendants to ask additional questions regarding possible racial prejudice or bias did not contribute to the judgment against Keating.

3. Keating also contends the trial court erred by refusing to transfer her case to juvenile court for sentencing and by allowing her to be sentenced as an adult. Keating's argument is based on Keating

having been a child 13 to 17 years of age at the time of her crime. See OCGA § 15-11-28 (b) (2) (D). But this enumeration of error is controlled adversely to Keating by Pascarella's appeal on the same grounds; she was age 15 at the time of the crime and convicted on the same count as Keating. See *Pascarella*, 294 Ga. App. at 415-417 (1), (2).

*Judgment affirmed. Barnes, P. J., and Blackwell, J., concur.*

DECIDED MAY 17, 2011 —
RECONSIDERATION DENIED JUNE 7, 2011.

*Mitchell D. Durham*, for appellant.
*Patrick H. Head, District Attorney, Anna G. Cross, Amelia G. Pray, Jesse D. Evans, Assistant District Attorneys*, for appellee.