## S10P1689. BRYANT v. THE STATE.
### (708 SE2d 362)

MELTON, Justice.

Nicholas Jason "JJ" Bryant was convicted of the murders of Billy Joe Kilgore and Marie Richards and the armed robbery of Richards.[1] After finding beyond a reasonable doubt the existence of multiple statutory aggravating circumstances in each murder, the

---

[1] The murders occurred on May 21, 2004. Bryant was indicted for two counts of malice murder and one count of armed robbery by a Douglas County grand jury on June 18, 2004. The State filed written notice of its intent to seek the death penalty on January 14, 2005. Jury selection began on October 9, 2007, and ended on November 6, 2007. Bryant's trial began on November 26, 2007. The jury found Bryant guilty of all counts of the indictment on December 8, 2007, and recommended a life sentence without the possibility of parole for Kilgore's murder and a death sentence for Richards' murder on December 13, 2007. On December 21, 2007, the trial court sentenced Bryant in accordance with the jury's recommendations and imposed a life sentence for the armed robbery. Bryant filed a motion for new trial on January 17, 2008, which he amended on November 16, 2009, and which the trial court denied on December 15, 2009. On January 11, 2010, the trial court granted Bryant a 30-day extension of time in which to file a notice of appeal, see OCGA § 5-6-39 (a) (1), and Bryant filed a notice of appeal on February 12, 2010. The appeal was docketed in this Court on July 7, 2010, for the September 2010 term of this Court, and the case was orally argued on February 7, 2011.

jury recommended a life sentence without the possibility of parole for Kilgore's murder and a death sentence for Richards' murder. Finding no reversible error in the guilt/innocence phase of Bryant's trial, we affirm the jury's verdict of guilt on all charges. However, because we conclude that the trial court erred in allowing the State to introduce unconstitutional victim impact testimony in the sentencing phase, we reverse the sentences of death and life without parole and remand the case for another jury to consider the proper sentences for the murders.

### Sufficiency of the Evidence

1. The evidence adduced at trial showed the following. In the spring of 2004, Bryant was recently paroled, unemployed, and involved in drugs. On May 21, 2004, a "really broke" Bryant got a ride to Kilgore's home, ostensibly for the purpose of earning some money by assisting Kilgore, who was 68 years old and suffering from various health problems that affected his mobility. After Bryant accompanied Kilgore while he ran some errands, the two men returned to Kilgore's home. Then Bryant got into another of Kilgore's automobiles and waited while Kilgore went into his home. A teenager doing chores for Kilgore saw Kilgore take approximately $2,200 and a .44-magnum revolver from his safe. When Kilgore came out of his home, he was accompanied by Richards, whom Bryant had never met. Richards and Kilgore got into the automobile with Bryant, and they left Kilgore's residence with Kilgore driving.

The following day, teenagers discovered Kilgore's body in the brush after noticing his automobile in a ditch off the roadway, almost completely hidden among kudzu vines. After the teens called 911, police discovered Richards' body, also in the brush. Kilgore's pockets were turned inside out. A few coins were found on the ground near his body, but neither his wallet nor any cash was ever found. As a result of their investigation, police arrested Bryant on May 24, 2004, in North Carolina, where he had fled after the shooting.

The State presented testimony showing that, at approximately 5:00 p.m. on the day of the murders, Bryant called his girlfriend and his sister to pick him up from the crime scene and that, when they did so, a bloody Bryant said that he had had a fight with Kilgore and that "he had shot [Kilgore] and a girl that was there." Evidence also showed that Bryant purchased a hotel room and a weed pipe and went "clubbing" in Buckhead on the night following the murders, although he had no money before the crimes. An acquaintance of Bryant testified that on the morning after the murders he drove Bryant to a dumpster, where Bryant disposed of a purse, and that Bryant told him that there was a gun inside the purse. The

acquaintance led police to the dumpster, where police recovered Richards' purse with Kilgore's revolver inside.

Bryant testified that he and the victims were en route to complete a drug deal when he and Kilgore argued, that Kilgore drove 30 to 50 feet down an abandoned, kudzu-covered driveway, and that he then turned around in his seat and pulled a gun on Bryant, who was sitting in the rear passenger seat behind Richards. Bryant claimed that he acted in self-defense after taking the gun from Kilgore, that he was in the rear seat area pushing against the headrest of the front passenger seat when he shot Kilgore in the head, and that he was coming out of the automobile when he shot Richards in the back and in the head. However, the State's ballistics expert, Kelly Fite, testified that the bullet that killed Kilgore and one of the bullets that struck Richards could not have been fired from inside the backseat of the automobile but were fired, instead, "from the passenger side of the vehicle probably outside the front door or right at the door."

An inmate testified that, while incarcerated with Bryant, Bryant told him that he shot Richards once in the back or side and once in the back of the head because "she was a liability, she could identify him." Also while incarcerated, Bryant wrote letters to his girlfriend attempting to persuade her to say that she was in the automobile at the time of the murders and that Bryant shot Kilgore after Kilgore shot Richards, and he wrote to family members asking their help in persuading his girlfriend to lie for him.

We find that the evidence, construed most favorably to the jury's verdicts, was sufficient to authorize a rational trier of fact to find Bryant guilty of the crimes charged beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); Unified Appeal Procedure IV (B) (2) (providing that, in all death penalty cases, this Court shall determine whether the verdicts are supported by the evidence).

## Pre-Trial Issues

2. Bryant contends that the trial court erred in failing to quash the indictment against him, because the manner in which the grand jury was selected violated constitutional and statutory law. Evidence presented at a pre-trial hearing showed that the voter registration list and the drivers' license list were merged to form the master grand jury source list from which the grand jury pool in this case was summoned, and Bryant does not challenge the composition of that master grand jury source list. Rather, he claims that African-American persons who were age 55 years old or older and Hispanic persons were under-represented in the composition of the grand jury

pool in violation of the Sixth and Fourteenth Amendments and OCGA § 15-12-40 as a result of the county's forced balancing system. Bryant has the burden of proving a prima facie case of constitutional error in the composition of the grand jury pool. See *Morrow v. State*, 272 Ga. 691, 693 (1) (532 SE2d 78) (2000). In order to prove a prima facie jury pool composition violation under either the Sixth Amendment, the Fourteenth Amendment, or OCGA § 15-12-40, Bryant was required to show that the allegedly excluded group was a cognizable group in the community and that such persons were actually under-represented. See *Rice v. State*, 281 Ga. 149, 149 (1) (635 SE2d 707) (2006).

(a) *African-American persons age 55 years old or older.* While African-American persons are a cognizable group as a matter of law, see *Spivey v. State*, 253 Ga. 187, 199 (7) (a) (319 SE2d 420) (1984), the question "[w]hether an *age* group is a cognizable group depends on the time and location of the trial. [Cit.]" *Jackson v. State*, 270 Ga. 494, 497 (4) (512 SE2d 241) (1999) (emphasis supplied). As Bryant presented no evidence that African-American persons who were age 55 years or older comprise a separate cognizable group in Douglas County, it follows that his claims here must fail. See *Potts v. State*, 259 Ga. 812, 813 (1) (388 SE2d 678) (1990) (listing the factors required to establish that a group is cognizable).

(b) *Hispanic persons.* While Bryant alleges that there were no Hispanic persons in the grand jury pool from which his grand jury was summoned because no persons from the "Other" racial group were selected from the master list to be placed on the list from which grand jurors were summoned, Bryant's expert testified at a pre-trial hearing that the term "Hispanic" is not a racial designation but, instead, usually refers to national origin, as is the case in the Census report. As a result, Hispanic persons would not only be represented in the "Other" racial group as Bryant contends. Indeed, Bryant's expert also testified that there "absolutely" would be Hispanics on the master grand jury list who were designated as being in one of the race categories (i.e. "Black," "White," and "Other"), as long as there had been no deliberate effort to screen such persons out, and Bryant failed to show that such an effort was made. Bryant presented no evidence regarding the actual percentage of Hispanic persons on the master grand jury source list. Because Bryant failed to show any actual under-representation of Hispanic persons, his claim here fails. See *Rice*, supra, 281 Ga. at 149 (1).

*Jury Selection Issues*

3. Bryant contends that the trial court erroneously excused for cause two potential jurors and erroneously qualified three potential

jurors based upon their views on sentencing. However, any erroneous failure to qualify or excuse for cause a prospective juror based on his or her responses during death qualification voir dire would entitle Bryant to a new sentencing trial only, as such error "would have related to the issue of sentence, not to guilt or innocence." *Skipper v. State*, 257 Ga. 802, 806 (8) (364 SE2d 835) (1988). See also *Nance v. State*, 272 Ga. 217, 224 (6) (526 SE2d 560) (2000); *Pope v. State*, 256 Ga. 195, 202 (7) (e) (345 SE2d 831) (1986), overruled on other grounds by *Nash v. State*, 271 Ga. 281 (519 SE2d 893) (1999). Thus, it is unnecessary for us to address this enumeration in light of our holding in Division 15, infra, reversing Bryant's sentences for the murders and granting him a new sentencing trial.

4. Bryant raises several enumerations of error regarding the trial court's conduct of voir dire in his case. As any errors concerning the death qualification voir dire would only entitle Bryant to a new sentencing trial, see *Skipper*, supra, 257 Ga. at 806 (8), we address only those issues with respect to death qualification voir dire that we view as likely to recur in a new sentencing trial.

(a) Bryant contends that the trial court overly restricted his voir dire, and he presents a litany of questions that he claims he should have been allowed to ask prospective jurors.

> The single purpose for voir dire is the ascertainment of the impartiality of jurors, their ability to treat the cause on the merits with objectivity and freedom from bias and prior inclination. Questions of a technical legal nature and questions that call for prejudgment are improper in a voir dire examination. Since there is often a fine line between asking potential jurors how they would decide the case and questions that merely seek to expose bias or prejudice, the scope of the voir dire examination, of necessity, must be left to the sound discretion of the trial court. After viewing the record, we conclude that the lengthy voir dire in this case was sufficient to ascertain the fairness and impartiality of the prospective jurors. We find no abuse of discretion by the trial court.

*Sallie v. State*, 276 Ga. 506, 510 (3) (578 SE2d 444) (2003). See *Waldrip v. State*, 267 Ga. 739, 742 (2) (482 SE2d 299) (1997) (finding no error in prohibiting questions "of a technical or legal nature, or questions which required the jurors to prejudge the case"); *Bramble v. State*, 263 Ga. 745, 745 (2) (438 SE2d 619) (1994) (finding no error in prohibiting questions regarding how the jurors would view the credibility of certain witnesses); *Roberts v. State*, 252 Ga. 227, 237 (10) (f) (314 SE2d 83) (1984) (finding no error in prohibiting

questions about jurors' views on the effectiveness of the death penalty).

(b) Bryant asserts that the trial court erred in excusing the first panel of jurors after defense counsel asked the jurors during panel voir dire whether hearing that Bryant had a felony conviction would make it more difficult for them to give him a fair trial and then revealed that a burglary conviction was involved. Pretermitting whether the trial court erred in finding the voir dire improper, see *Laster v. State*, 276 Ga. 645, 647 (2) (581 SE2d 522) (2003) (finding no error in prohibiting questions about the defendant's prior conviction that would be introduced as a similar transaction at trial), and in excusing the panel,

> [i]t is well established that the system by which juries are selected does not include the right of any party to select certain jurors but to permit parties to protect themselves against prejudice by allowing them to exclude unacceptable jurors. Defendant has no vested right to a particular juror.

*Cannon v. State*, 288 Ga. 225, 228-229 (5) (702 SE2d 845) (2010) (citation and punctuation omitted). As Bryant has made " 'no showing that a competent and unbiased jury was not selected, the assertion of error is without merit.' [Cit.]" Id. at 229 (5).

(c) Bryant contends that the trial court violated his due process rights by changing the procedures and questions allowed throughout voir dire. After a thorough review of the entire voir dire transcript in Bryant's case, we conclude that the trial court did not abuse its discretion in its conduct of voir dire here. See *Ramirez v. State*, 279 Ga. 569, 573 (4) (619 SE2d 668) (2005) (stating that the control of voir-dire examination is vested in the sound legal discretion of the trial court).

(d) The trial court also did not abuse its discretion in denying Bryant's motion to allow the videotaping of voir dire. See id.

(e) Although a prospective juror who was a convicted felon stated that his civil rights had been restored, the trial court granted the State's motion to disqualify the juror over Bryant's objection after the juror failed to provide any information or documentation verifying his claim. See OCGA § 15-12-163 (b) (5) (providing that, in jury trials in felony cases, either the State or the accused may object to the seating of a juror who is a convicted felon and whose civil rights have not been restored). Bryant contends that the trial court erred in doing so. However, " '[t]he erroneous allowing of a challenge for cause affords no ground of complaint if a competent and unbiased jury is finally selected.' " *Wells v. State*, 261 Ga. 282, 282-283 (2) (404 SE2d 106) (1991) (citation omitted). Therefore, assuming arguendo

that the juror's disqualification was error, this enumeration provides no basis for reversal, because Bryant has not shown that the jurors selected to decide his case were incompetent or biased. See *Humphreys v. State*, 287 Ga. 63, 71 (4) (694 SE2d 316) (2010) (holding that a juror's erroneous disqualification under OCGA § 15-12-163 (b) (5) was not reversible error).

(f) In light of our holding in Division 15, infra, we need not address Bryant's contention that the trial court erred in conducting the death qualification voir dire of the prospective jurors in panels eight through eleven, as any error here, which would only entitle Bryant to a new sentencing trial, is not likely to recur.

5. We find no abuse of discretion in the trial court's denial of Bryant's motion that the jury not be sequestered. See *Lamar v. State*, 278 Ga. 150, 155 (12) (598 SE2d 488) (2004) ("[A] trial court is clearly authorized by OCGA § 15-12-142 (a) to maintain jury sequestration over a death penalty defendant's objection").

6. Bryant contends that the trial court failed to comply with OCGA § 15-12-1 (a) (1), (3). That statute provides that "any person who is the primary caregiver . . . of a child six years of age or younger, who executes an affidavit . . . stating that such person has no reasonably available alternative child care" shall be excused or deferred upon request. Although affidavits were not provided to potential jurors, before granting any excusal the trial court examined on the record individually and under oath those potential jurors who identified themselves as primary caregivers as defined in OCGA § 15-12-1 regarding their role as caregivers and their statutory right to be excused. While the trial court failed in some cases to inquire about what alternative childcare was available to the prospective juror, we do not find "such disregard of the essential and substantial provisions of the statute as would vitiate the array[ ]." *Franklin v. State*, 245 Ga. 141, 147 (1) (e) (263 SE2d 666) (1980), overruled on other grounds by *Nash v. State*, 271 Ga. 281, 281 (519 SE2d 893) (1999).

7. Bryant asserts that the State's use of peremptory strikes to excuse two African-American prospective jurors, Jurors Sparks and McIntosh, violated the principles established in *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). "A trial court's findings on whether the opponent of the strike has met his burden of persuasion is entitled to great deference and will be affirmed unless clearly erroneous. [Cit.]" *Barnes v. State*, 269 Ga. 345, 349 (6) (496 SE2d 674) (1998).

The State explained that it excused Juror Sparks for the following reasons: the trial court had to wait on him twice, as he was 30 to 45 minutes late for panel voir dire and at least an hour late on the day that the jury was struck; he told the court that he was the sole support for his five children and his ex-wife, that jury service

would "buckle his knees" financially, and that his utilities would be turned off if he had to serve;[2] he asked the court what would happen if he wanted to impose a sentence of life with parole and the remaining jurors opted for life without parole, and he said that the death penalty would be a "last resort" option for him; and he had children in the same age range as Bryant. The State's tendered reasons were facially race-neutral. See *Hernandez v. New York*, 500 U. S. 352, 358 (II) (A) (111 SC 1859, 114 LE2d 395) (1991) (plurality opinion). See also *Barnes*, supra, 269 Ga. at 349-351 (6); *Davis v. State*, 263 Ga. 5, 8 (10) (426 SE2d 844) (1993). Further, the record contains support for the State's explanations for the striking of this juror. However, Bryant contends that the State's articulated reasons were pretextual. See *Snyder v. Louisiana*, 552 U. S. 472, 485 (128 SC 1203, 170 LE2d 175) (2008).

This Court has carefully noted Bryant's argument that white jurors exhibiting one, and in one case, two, of the characteristics named by the State for striking Juror Sparks were not stricken by the State and, thus, that the State's stated reasons were pretextual. However,

> [Juror Sparks] was the *only* prospective juror who had *all* of these characteristics. [Cit.] Under these circumstances, [Bryant] has not supported his claim that the State's reasons were pretextual. Rather, the record supports the trial court's determination that a discriminatory purpose was not involved in the State's use of a peremptory strike to remove [Juror Sparks]. [Cit.]

*Burgess v. State*, 264 Ga. 777, 782 (11) (450 SE2d 680) (1994).

The State also gave several reasons for excusing Juror McIntosh, one of which was his religious views. The State explained Juror McIntosh's religious views as follows: his religion taught not to judge; he would have to seek prayerful answers "to conflicts of law when the judge gave instructions versus what his religion [taught]"; based on his religious beliefs, he would not want to judge; he believed that vengeance belonged to God, not to man; and, if a conflict arose between the jury instructions and his religious beliefs, he would look to God for the answer as to what he should do. The State also stated that Juror McIntosh was "very weak" on the death penalty, that he had lived in the county only three-and-a-half-years, and that he had

---

[2] Although the trial court inquired into financial hardship before individual voir dire began, Juror Sparks did not disclose the extent of his economic situation at that time. The trial court apparently had a policy of refusing to reconsider excusals for hardship once a juror's death qualification voir dire had begun.

a son in the same age range as Bryant. The State's reasons are facially race-neutral, and the prosecutor's interpretation of McIntosh's religious views is supported by the record.

However, Bryant argues that *Batson* extends to the State's use of peremptory strikes against individuals based on their religious affiliation, and he asserts that the State's other reasons for its strikes were pretextual. As an initial matter, Bryant has provided no authority for his argument that *Batson* extends to the use of peremptory strikes against individuals based on their religious affiliation. Moreover, even assuming arguendo that *Batson* would somehow apply to the use of strikes against individuals based on their religious affiliation, a review of the record shows that the State did not strike Juror McIntosh based on his religious affiliation. Rather, the State exercised its peremptory strike against him based on a legitimate concern that his religious beliefs affected his views on judgment and punishment and that, in turn, those beliefs would affect his ability to follow the court's instructions should the two conflict. Bryant also failed to show that there were white jurors who were not struck by the State who expressed similar views. Pretermitting whether the additional reasons the State gave for striking Juror McIntosh were pretextual, the State set forth a race-neutral reason that did not apply to those other jurors that contributed to its final decision to strike Juror McIntosh. Therefore, the trial court did not abuse its discretion in finding no discrimination. See *King v. State*, 273 Ga. 258, 269-270 (22) (f) (539 SE2d 783) (2000) (affirming the trial court's finding of no discrimination where the defendant argued that other jurors exhibiting one of the same factors cited by the State were not stricken, but where the State also cited other factors that did not apply to the seated jurors that contributed to its final decision to strike the juror).

## Guilt/Innocence Phase Issues

8. Bryant complains that certain testimony was erroneously admitted into evidence under OCGA § 24-9-83. That statute provides that, before a witness may be impeached by his prior inconsistent statement, "the time, place, person, and circumstances attending the former statements shall be called to his mind with as much certainty as possible." In this regard,

> [t]he cross-examiner will ask the witness whether he made the alleged statement, giving its substance, and naming the time, the place, and the person to whom made. . . . If the witness denies the making of the statement, or *fails to*

*admit it,* . . . then the requirement of "laying the foundation" is satisfied and the cross-examiner, at his next stage of giving evidence, may prove the making of the alleged statement.

(Emphasis supplied.) *Carter v. State,* 244 Ga. 803, 806 (262 SE2d 109) (1979) (citations and punctuation omitted). The purpose of the statutory requirement for laying such a foundation "is to give the witness an opportunity to admit, explain, or deny the prior contradictory statement." *Duckworth v. State,* 268 Ga. 566, 567-568 (492 SE2d 201) (1997).

With those principles in mind, a review of the record in this case shows that, shortly after Bryant became a suspect in the victims' murders, Investigator Bruce Ferguson interviewed Bryant's sister, Amanda Bryant, and that Ms. Bryant was called as a witness for the State at trial. On direct examination, Ms. Bryant twice acknowledged that she had recently reviewed the videotape of her statement that she made to Investigator Ferguson but testified that she could not remember it.[3] The prosecutor questioned Ms. Bryant about the substance of several statements that she made to Investigator Ferguson, naming the time, the place, and the circumstances surrounding the statement. While Ms. Bryant answered a few of the prosecutor's questions, she testified that she could not remember numerous statements, particularly those statements that were damaging to her brother. Investigator Ferguson later took the stand and testified regarding Ms. Bryant's prior inconsistent statements while referring to what he explained were his "pretty much verbatim" notes of his videotaped interview with Ms. Bryant.

(a) Bryant alleges that Investigator Ferguson was improperly allowed to testify to two of Ms. Bryant's prior statements without Ms. Bryant's having been confronted with the substance of those statements, and thus that the trial court erred in allowing Investigator Ferguson's testimony that Ms. Bryant told him during the interview that (1) Ms. Bryant told her mother that she thought Bryant was going to steal from Kilgore and (2) that she believed that her brother had robbed Kilgore. However, based on Ms. Bryant's consistent refusal during her testimony to admit to the substance of any damaging statements about her brother that she made to police (despite having twice reviewed her own videotaped statement), we conclude "that in these circumstances the requirements of the Code

---

[3] The trial court described Ms. Bryant as a hostile witness, noting that she "was profoundly uncooperative in the State's examination of her," as "basically her primary answer was that she didn't remember much of anything that she didn't want to testify about that was adverse to the defendant."

section were met sufficiently to permit the state to impeach its witness by proof of prior contradictory statements." *Meschino v. State*, 259 Ga. 611, 615 (2) (c) (385 SE2d 281) (1989) (proper foundation was laid for the use of prior inconsistent statements where the witness, who was the defendant's wife, acknowledged that she could "vaguely remember" having made "some kind of statement" to law enforcement after the crime). See also *Cummings v. State*, 280 Ga. 831, 832-833 (2), (3) (632 SE2d 152) (2006) ("[T]estimony that a witness does not recall certain details which have previously been included in a prior statement is inconsistent with the prior statement about those details . . . [and] [t]here is no . . . 'denial' requirement [relating to a witness' testimony about prior statements] under [OCGA § 24-9-83]"). In any event, any error in admitting Investigator Ferguson's testimony was rendered harmless by Ms. Bryant's subsequent testimony when she was recalled to the stand, asked whether she recalled telling Investigator Ferguson what she believed her brother had done, and she denied telling Investigator Ferguson that her brother had done anything. See *London v. State*, 274 Ga. 91, 94 (4) (549 SE2d 394) (2001) (assuming arguendo that a witness's prior inconsistent statements were admitted without the proper foundation and applying harmless error analysis); *Buchanan v. State*, 282 Ga. App. 298, 300 (638 SE2d 436) (2006) (finding no reversible error in the admission of a prosecution witness' prior inconsistent statements because the witness' testimony on cross-examination fulfilled the purposes of the foundational requirement).

(b) Bryant also claims that the proper foundation was not laid for Ms. Bryant's prior inconsistent statements that were admitted through the testimony of LaTasha Black, Bryant's girlfriend at the time of the murders. On direct examination, Ms. Bryant alternatively denied and failed to recall speaking with her brother when he called the apartment where he and Black were living on the afternoon that the crimes were committed. After Ms. Bryant testified, Black took the stand and testified that, when Bryant called on the afternoon of the crimes, she answered the telephone and gave it to Ms. Bryant when Bryant asked to speak with his sister. Black also testified that she observed Ms. Bryant speaking with Bryant. Black's statements here were admissible without a foundational requirement to impeach Ms. Bryant's testimony pursuant to OCGA § 24-9-82, i.e., by disproving the facts testified to by her. Black also testified that, after hanging up, Ms. Bryant told her that "she thought that JJ had done something and that he maybe robbed [Kilgore]." Contrary to Bryant's contention that a sufficient foundation had not been laid for the admission of this statement, a sufficient foundation had been laid for this testimony when Ms.

Bryant was specifically questioned on direct examination about the circumstances surrounding Bryant's telephone calls on the afternoon of the crimes and she denied having spoken with him. Indeed, by denying that she had spoken with Bryant at all by phone, Ms. Bryant was also denying that she could have relayed any statements that Bryant allegedly made to her during the course of any such phone call. See *Holiday v. State*, 272 Ga. 779, 781 (2) (534 SE2d 411) (2000) (prior inconsistent statements were admissible for impeachment purposes and as substantive evidence where witnesses denied or could not remember specific details of their statements). See also *Meschino*, supra; *Cummings*, supra.

(c) Bryant contends that the testimony of Black and Investigator Ferguson constituted improper opinion testimony that it was Ms. Bryant's opinion that her brother had robbed or intended to rob Kilgore. See OCGA § 24-9-65. "In order to raise on appeal an impropriety regarding the admissibility of evidence, the specific ground of objection must be made at the time the evidence is offered, and the failure to do so amounts to a waiver of that specific ground." *Sanchez v. State*, 285 Ga. 749, 751 (3) (684 SE2d 251) (2009) (citations and punctuation omitted). Because Bryant failed to object to either Investigator Ferguson's or Black's testimony on this ground, he has waived the ability to raise this issue on appeal.

(d) Bryant also asserts that the trial court erred in allowing Investigator Ferguson to testify as to Black's prior consistent statements when the veracity of Black's trial testimony had not been placed in issue. See *Still v. State*, 260 Ga. 463, 464 (3) (b) (396 SE2d 898) (1990). Here, however, the topic of what Black told Investigator Ferguson during his interview with her first was introduced by defense counsel on his cross-examination of Investigator Ferguson. Bryant cannot complain that, in the subsequent redirect examination of its witness, the State pursued the topic that his own counsel previously had introduced. See *Williams v. State*, 263 Ga. 135, 137 (5) (429 SE2d 512) (1993). Moreover, after the State pursued the topic on redirect examination of its witness, defense counsel elicited on recross-examination even more details of Black's prior consistent statements. Accordingly, we find no error. See *Warbington v. State*, 267 Ga. 462, 463 (2) (479 SE2d 733) (1997) (finding no error in the State's pursuit of the topic of "prior difficulties" between the defendant and the victim, even though the State had not filed notice of its intent to offer that evidence, where the topic was first introduced by defense counsel on cross-examination).

9. The State introduced the testimony of Garrett Ledbetter, a jail inmate who had been incarcerated with Bryant. Ledbetter testified that Bryant told him that he considered robbing and shooting a drug dealer before the murders but that he did not follow through,

because he hesitated when he heard a nearby child and lost the opportunity. Ledbetter also testified that Bryant said that, if he had gone through with that robbery, he would not be in his current situation. Bryant contends that the trial court erroneously admitted this testimony on two grounds.

(a) Bryant claims that Ledbetter's testimony constituted similar transaction evidence and was inadmissible without compliance with Uniform Superior Court Rule ("USCR") 31.3. However, "a defendant's incriminating statement is admissible when it constitutes an admission against the defendant's penal interest because a *defendant's* declaration against penal interest is the admission of a party-opponent." (Citations and punctuation omitted; emphasis in original.) *Teal v. State*, 282 Ga. 319, 327 (3) (647 SE2d 15) (2007). See *Stanford v. State*, 272 Ga. 267, 269-270 (4) (528 SE2d 246) (2000) (in a malice murder prosecution, police officer's testimony as to what the defendant told him in connection with a woman's death in an unrelated incident was admissible over a hearsay objection as a party opponent's admission against his own penal interest). Here, Bryant's statements to Ledbetter were admissible as an admission against his penal interest, because Bryant's statements about the other planned robbery and his regret for not having gone through with it were the admissions of a party-opponent. See OCGA § 24-3-34. See also Milich, Georgia Rules of Evidence, § 18.3 (2d ed.).

(b) Bryant contends that he did not receive notice of Ledbetter's last statement that Bryant said that he would not be in his current situation if he had gone through with the contemplated robbery. Thus, he contends that the statement should have been excluded. See OCGA § 17-16-4 (detailing the State's discovery obligations regarding a defendant's in-custody statement). "Excluding evidence is a harsh sanction and should be imposed only when there is a showing of prejudice to the defense and bad faith by the State." *Fairbanks v. State*, 242 Ga. App. 830, 832 (2) (531 SE2d 381) (2000) (punctuation and footnote omitted). See also OCGA § 17-16-6 (outlining proper remedies for discovery violations).

The record here shows that the defense had the opportunity to interview and, in fact, did interview Ledbetter before trial. Moreover, in light of Ledbetter's testimony that, prior to the commission of the crimes here, Bryant contemplated committing a similar crime, we fail to see how the "if only" statement prejudiced him by showing any significant additional evidence of premeditation. Although Bryant claims that the prosecutor used Ledbetter's statement in his closing argument, it was actually the portion of Ledbetter's statement that the prosecutor had given proper notice of that the prosecutor invoked. Finally, there is no evidence in the record, and Bryant has presented none, to show that the State acted in bad faith.

Therefore, we find that the trial court did not abuse its discretion under OCGA § 17-16-6 in admitting the statement. See *Murray v. State*, 293 Ga. App. 516 (667 SE2d 382) (2008).

10. Bryant contends that the trial court erred in admitting evidence of his bad character in violation of OCGA § 24-2-2. Under that statute, "[t]he general character of the parties and especially their conduct in other transactions are irrelevant matter unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct." The admission or exclusion of such evidence lies within the trial court's sound discretion, and the trial court's decision will not be disturbed on appeal absent a clear abuse of that discretion. See *Benford v. State*, 272 Ga. 348, 350 (3) (528 SE2d 795) (2000).

(a) Evidence that Bryant used and dealt in drugs was properly admitted, given the role that drugs and drug trafficking played in the events leading up to the crimes and the reasonable inference that the jury could have drawn from the evidence that Bryant's motive in murdering the victims was to obtain Kilgore's drugs or his money that was to be used in a drug transaction. Moreover, Bryant himself testified that the parties were on their way to make a drug buy when the crimes occurred and that Kilgore pulled the gun on him after he told Kilgore that he was not going to take him to his drug connection. See id.; *Cook v. State*, 274 Ga. 891 (561 SE2d 407) (2002) (evidence of the defendant's marijuana use and sale was admissible where the State connected that evidence to the defendant's motive for murdering his mother).

(b) Bryant contends that two statements from his taped telephone calls from jail should have been excluded. We disagree.

i. Bryant's statements that he would not "plea out" and that he preferred a death sentence to remaining in prison for the rest of his life were contained in a telephone call to Ms. Bryant that was introduced to impeach Ms. Bryant's testimony that Bryant did not try to influence her testimony, and Bryant contends that those statements were irrelevant and prejudicial bad character evidence. Pretermitting whether such statements constitute evidence of bad character, when the challenged statements are viewed in context, we find that they were a significant part of the emotional pressure that Bryant was putting on Ms. Bryant regarding her role in the prosecution against him, as the statements were part of his attempt to convey to her the reality that he was going to trial and that he faced a possible death sentence. Accordingly, they were relevant to impeach Ms. Bryant's testimony that Bryant did not try to influence her testimony. Therefore, the trial court did not abuse its discretion in admitting them.

ii. Bryant also challenges the admission of the following state-

ment: "The last thing I'll say in that goddamned chamber before I die is you f——— sorry b———. I'll see you in hell." Bryant contends that this statement expressing his ill feeling toward his sister for being a witness for the State was admitted to impeach her testimony that he had not tried to influence her testimony. He complains that it was not impeachment evidence but improper bad character evidence, because the statement was made in a telephone call to Bryant's aunt and, thus, could not reflect any pressure that he put on Ms. Bryant.

However, a review of the record shows that the State did not introduce this statement to impeach Ms. Bryant. Instead, after Bryant testified that the ill feeling that he had toward his sister for talking to the police and testifying for the State was "over two years ago," the State introduced the tape containing the challenged statement to impeach Bryant, because the telephone call to his aunt was recorded approximately a year ago. Thus, we find no error in its admission here. See *Cooper v. State*, 272 Ga. App. 209, 210 (612 SE2d 42) (2005) ("[T]he State may impeach the defendant with evidence reflecting badly on his character, as long as that evidence proves the defendant's specific testimony false"); OCGA § 24-9-82.

(c) We have reviewed the remaining admissions of which Bryant complains, and we find no reversible error. See *Benford*, supra, 272 Ga. at 350 (3).

11. Bryant contends that the State committed prosecutorial misconduct by referring to the bad character evidence referenced in Division 10 in its closing argument. However, as discussed above, that evidence was relevant to the State's case and was properly admitted. Moreover, the only statement to which Bryant objected was the State's comment that Bryant was a "predator." That remark was permissible as a reasonable inference drawn from Bryant's own testimony that he had taken the victims' property after killing them and that he had attempted to suborn perjury in order to protect himself. Therefore, we find no error here. See *Wyatt v. State*, 267 Ga. 860, 864 (2) (a) (485 SE2d 470) (1997); *Cooper v. State*, 178 Ga. App. 709, 712 (3) (345 SE2d 606) (1986) (finding the prosecutor's reference to the defendant as a "pervert" and a "loan shark" during closing argument were based on reasonable inferences raised by the evidence at trial). Because Bryant's remaining objections to the State's closing arguments were not made at trial, they have been waived as to his guilt. *Gissendaner v. State*, 272 Ga. 704, 713 (10) (b) (532 SE2d 677) (2000). Even assuming arguendo that the prosecutor's remarks were improper, in light of our decision reversing Bryant's death sentence, we need not decide whether there is a reasonable probability that the remarks affected the jury's exercise of discretion in choosing Bryant's sentences. See id.

12. Bryant contends that the trial court erred in failing to give his requested charge on voluntary manslaughter in regard to the shooting of Richards.[4] "It is a question of law whether there is any evidence to support a finding that the defendant acted 'solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person. . . .' OCGA § 16-5-2 (a). [Cit.]" *Paul v. State*, 274 Ga. 601, 605 (3) (b) (555 SE2d 716) (2001).

The only evidence that Bryant offered in support of his request for a voluntary manslaughter charge was his own testimony. A review of that testimony shows that Richards was not involved in the argument between Bryant and Kilgore that preceded Kilgore's pulling the gun on Bryant, nor was she involved in the struggle for the gun when Bryant took the gun away from Kilgore. Although, according to Bryant, Richards was in his way as he was trying to exit the rear seat of the two-door automobile to get away from Kilgore and she scratched his hand as both he and Richards tried to reach for the door handle, Bryant testified that he "really d[id]n't know" whether she was trying to get out of the car herself, trying to hurt him, or trying to take the gun away from him. Moreover, Bryant was unequivocal in his testimony that he shot Kilgore first when Kilgore pulled on his shorts and that he then pointed at and shot Richards from the back after knowing that he had shot Kilgore, despite the fact that Richards had not threatened him in any way. In no way does this evidence suggest that, when Bryant shot Richards, he acted out of "sudden, violent, and irresistible passion," as a reasonable person would have done in similar circumstances. See *Jackson v. State*, 282 Ga. 494, 498 (4) (651 SE2d 702) (2007); *Worthem v. State*, 270 Ga. 469, 470-471 (2) (509 SE2d 922) (1999). Compare *Webb v. State*, 284 Ga. 122, 125-126 (4) (663 SE2d 690) (2008). Accordingly, the trial court did not err in refusing to give Bryant's requested jury charge here.

13. Bryant claims that the trial court improperly denied his motion to suppress letters that Bryant wrote and deposited in the inmates' outgoing mail at the Douglas County Jail while he was awaiting trial that were seized pursuant to a search warrant. On appeal, we pay substantial deference to the decision of the magistrate to issue the warrant, and we construe the evidence to uphold the findings of the trial court unless they are clearly erroneous. See *Herrera v. State*, 288 Ga. 231, 233 (2) (702 SE2d 854) (2010); *DeYoung v. State*, 268 Ga. 780, 787 (7) (493 SE2d 157) (1997).

---

[4] The trial court charged the jury regarding voluntary manslaughter in regard to Kilgore's shooting.

The search warrant in this case was supported by Investigator Ferguson's affidavit, which pertinently provided as follows:

> On January 18, 2005, a confidential informant that I believe to be truthful told me that Jason Bryant was sending a letter to his girlfriend, LaTasha Black[,] telling her what happened on May 22nd, 2004, the day of the double homicide.[5] The confidential informant told me the reason for this letter or letters is Jason wants LaTasha to tell law enforcement that she was there with Jason during the murders and wants her to tell law enforcement that the shootings [were] in self-defense. The confidential informant told me he read one of the letters and said the letters are suppose[d] to be mailed some time this week. (January 19th - January 23rd, 2005). The confidential informant has given me other information involving this case and I have confirmed that the information he gave was truthful.
>
> Based on what the confidential informant told me, affiant believes that the letter or letters that Jason Bryant [is] mailing out the week of January 19th, 2005 are letters telling LaTasha Black to tell law enforcement that she was there on May 22nd, 2004, the day of the homicides and to tell law enforcement that the shooting[s] were in self-defense.

At the suppression hearing, Investigator Ferguson testified that the confidential informant was Bryant's cell mate at the time and that the informant had previously provided information to him that Bryant was manipulating his cell door lock in order to exit his cell and that Bryant kept a razor blade under his bunk. He testified that, while some details surrounding this information had proven inaccurate, he had verified that the basic information provided was true.

(a) *Insufficient Probable Cause.* We review the search warrant to determine the existence of probable cause using the totality of the circumstances analysis set forth in *Illinois v. Gates*, 462 U. S. 213 (103 SC 2317, 76 LE2d 527) (1983). See *State v. Stephens*, 252 Ga. 181, 182 (311 SE2d 823) (1984).

Bryant argues that the warrant lacked probable cause, because Investigator Ferguson failed to disclose that the informant was an inmate at the Douglas County Jail at the time that he provided the information in the affidavit and because Investigator Ferguson

---

[5] The murders actually occurred on May 21, 2004. The bodies of the victims were discovered on May 22, 2004.

offered insufficient information as to the unnamed informant's reliability. We disagree.

> [T]he sufficiency of information obtained from an informant is not to be judged by any rigid test. Generally, probable cause is determined by the totality of the circumstances surrounding (1) the basis of the informant's knowledge and (2) the informant's veracity or reliability. A deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.

*State v. Hall*, 276 Ga. App. 769, 774 (624 SE2d 298) (2005) (citation omitted).

Applying this test to the affidavit, we note the following. Investigator Ferguson averred that the informant had provided other information involving Bryant's case that he had confirmed as truthful. Contrary to Bryant's contention, as Investigator Ferguson was the lead investigator on Bryant's case, this is some indication of the informant's reliability. See *Lance v. State*, 275 Ga. 11, 21 (19) (b) (560 SE2d 663) (2002) (finding "nothing objectionable" in the magistrate's partial reliance on a "confidential" witness's report, because the affidavit "indicated that the witness had previously given information that had led to the discovery of 'fruits' of the murders committed in this case"). Moreover, the grounds for the informant's knowledge here are substantial because he personally read one of the letters. See *Rocha v. State*, 284 Ga. App. 852, 853 (644 SE2d 921) (2007) (citing the fact that the informant's tip was based on personal observation as a factor in establishing the tip's sufficiency without independent corroboration). Furthermore, the informant identified the intended recipient of the letters both by her full name and by her relationship to Bryant, and the tip described what Bryant was going to ask Black to tell law enforcement, how it would help him in his case, and when the letters were supposed to be mailed. We conclude that the informant described Bryant's criminal activity in such detail that the issuing judge could reasonably infer that the informant had obtained his information in a reliable way. See *Branton v. State*, 240 Ga. App. 106, 107-108 (522 SE2d 694) (1999) (relying on a detailed description of criminal activity to support probable cause). Therefore, even if the omitted information that the informant was a jail inmate had been included in the affidavit, there is still sufficient information under the totality of the circumstances to find probable cause for the issuance of the search warrant. See *Sullivan v. State*, 284 Ga. 358, 361 (2) (667 SE2d 32) (2008) (where a court determines that a submitted affidavit contains

a material omission, the affidavit must be reexamined with the omission included to determine whether probable cause exists to issue a warrant). Finally, no independent corroboration of criminal activity or other evidence was required, because the informant's basis of knowledge and reliability were sufficiently established. See *Sanders v. State*, 252 Ga. App. 609, 612 (1) (556 SE2d 505) (2001).

(b) *Insufficient Particularity.* Bryant also claims that the search warrant failed to state with sufficient particularity the things to be seized. In determining whether the particularity requirement is sufficiently met in the warrant, "our courts read the warrant as a whole and consider other evidence, including, but not limited to, the supporting affidavit." *Battle v. State*, 275 Ga. App. 301, 301 (620 SE2d 506) (2005). In this case, the warrant authorized the executing officers to search for Bryant's outgoing and incoming non-legal mail, and it stated that no letters marked "Legal" or letters addressed to Bryant's counsel could be searched. The warrant also parenthetically provided the names of Bryant's attorneys.

At the suppression hearing, Bryant argued that the search warrant violated the particularity requirement because it failed to specify a crime and that it was not saved by the information in the affidavit because the affidavit only limited the search to "some evidence in a case" without setting out the facts of the case. He now asserts for the first time on appeal that the fact that the affidavit contained the crime for which Bryant was charged does not cure the search warrant's lack of particularity because the affidavit was not incorporated into the search warrant by reference or attached to it. See *Groh v. Ramirez*, 540 U. S. 551 (124 SC 1284, 157 LE2d 1068) (2004) (a search warrant that contained no description of the evidence sought was not saved by the fact that the warrant application contained a particularized description where the application was not incorporated by reference in the search warrant and did not accompany the warrant); *Battle*, supra, 275 Ga. App. at 303. Because Bryant did not raise this argument in his motion to suppress, he has waived it here. See *Locher v. State*, 293 Ga. App. 67, 68-69 (1) (666 SE2d 468) (2008) ("[I]n challenging a trial court's denial of a motion to suppress, a defendant may not argue on appeal grounds that he did not argue (and obtain a ruling on) below.") (citation omitted). See also *Tarvin v. State*, 277 Ga. 509, 511 (4) (591 SE2d 777) (2004). Notwithstanding his waiver, however, this argument is unavailing.

A review of the record shows that the warrant, warrant application, and warrant affidavit constituted one package attached together and that the warrant application referenced "Exhibit A," which was the warrant affidavit. Therefore, pretermitting whether the description in the actual warrant failed to provide the necessary particularity, we find no error in the trial court's reliance upon the affidavit.

In light of our decision above, we need not address Bryant's contention that the trial court erred in admitting the letters on the alternative basis that a search warrant was not required for the seizure of his outgoing mail from the jail.

14. Bryant contends that the trial court erred in finding that he waived the attorney-client privilege on direct examination with regard to his preparation with counsel for testifying at trial and that the prosecutor's subsequent line of questioning undermined his and his counsel's credibility before the jury. See OCGA §§ 24-9-21 and 24-9-24. As a result of the trial court's ruling, the prosecutor questioned Bryant about whether he had "practic[ed]" with his previous counsel regarding how he would answer questions on cross-examination, and Bryant responded that his counsel "never went over what they were going to ask [him]" but only counseled him that he should remain self-controlled. While we do not condone such a line of questioning, we cannot conclude that a jury would think less of counsel for preparing their client emotionally to testify in his death penalty trial. Moreover, in light of the evidence that Bryant told several versions of how the crimes occurred and that he wrote to his girlfriend asking her to falsely testify that she was with him at the time of the crimes, that Kilgore shot Richards, and that Bryant shot Kilgore in self-defense because "no jury would ever find [him] guilty after . . . some[one] told them that story," we find that any error here was harmless. See *Williams v. State*, 258 Ga. 281, 285 (5) (c) (368 SE2d 742) (1988) (applying harmless error analysis where testimony violated a defendant's attorney-client privilege).

*Sentencing Phase Issues*

15. Bryant contends that the trial court erred by refusing to exclude several portions of the victim impact testimony presented at trial. See OCGA § 17-10-1.2 (authorizing victim impact testimony); *Livingston v. State*, 264 Ga. 402 (444 SE2d 748) (1994) (finding constitutional OCGA § 17-10-1.2 and, thus, the admission of victim impact evidence generally).

(a) In *Payne v. Tennessee*, 501 U. S. 808 (111 SC 2597, 115 LE2d 720) (1991), the United States Supreme Court overruled its previous decision in *Booth v. Maryland*, 482 U. S. 496 (107 SC 2529, 96 LE2d 440) (1987), which prohibited evidence and argument relating to the victim and the impact of the victim's death on the victim's family at a capital sentencing trial. However, this Court has repeatedly noted that "*Payne* left *undisturbed Booth's* holding that the state could not use information or testimony concerning 'a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence.' " (Emphasis supplied.) *Sermons v. State*,

262 Ga. 286, 287 (1) (417 SE2d 144) (1992) (quoting *Payne*, 501 U. S. at 830, n. 2). See *Stinski v. State*, 286 Ga. 839, 854 (55) (691 SE2d 854) (2010); *Livingston*, supra, 264 Ga. at 402, n. 2. Here, the State presented two witnesses to give victim impact testimony: Kilgore's daughter and Richards' sister. We first address Bryant's contention that a portion of Richards' sister's testimony could only be construed as a plea to the jury to recommend a death sentence in his case.

A review of the trial transcript shows that, in response to Bryant's objection at the hearing held pursuant to *Turner v. State*, 268 Ga. 213 (486 SE2d 839) (1997), the trial court redacted from Richards' sister's proposed statement several lines in which she addressed the issue of punishment and then said to the prosecutor and defense counsel, "If there [are] any *other* references to the ultimate punishment, that should be redacted, but as I said, I didn't see any others." (Emphasis supplied.) At that point, defense counsel renewed the defense's objections that had been overruled and acknowledged that the trial court had sustained the defense's objection to "the call for a specific punishment." However, defense counsel did not point out any additional material in Richards' sister's statement that needed to be redacted. Therefore, assuming that Richards' sister's redacted statement should be construed as a request for the death sentence as specific punishment in Bryant's case, Bryant may not complain on appeal about the trial court's failure to further redact the statement because he failed to point out any additional references in the statement as a call for a specific punishment when requested to do so by the trial court.[6] See *Holcomb v. State*, 268 Ga. 100, 103 (2) (485 SE2d 192) (1997) ("A party may not complain on appeal of a ruling that he contributed to or acquiesced in by his own action, trial strategy, or conduct. [Cit.]").

We do find, however, that much of the victim impact *testimony* admitted over Bryant's objection was improper. We reject the State's argument that there is no prohibition against a witness describing the crime because this State's statute governing victim impact evidence specifically allows the victim impact witness to describe the

---

[6] We note that, after Richards' sister completed her testimony and the State rested its case, defense counsel did raise an objection that, "[w]hile not stating a specific punishment," the witness had "impli[ed] the request for the death penalty." However, in his objection defense counsel misstated to the trial court that the witness had read portions of the statement that the trial court had earlier redacted as "references to the ultimate punishment." As the prosecutor pointed out to the trial court and as the record supports, the witness read only the edited, redacted version that the trial court provided. Therefore, even assuming that Bryant's objection here was timely, the trial court was never called upon to make a ruling that the combination of statements Bryant now challenges constituted an implied request for a death sentence. Accordingly, this allegation of error is waived. See *Black v. State*, 248 Ga. App. 626, 627 (548 SE2d 9) (2001) ("[N]o issue is presented for appellate review regarding a question of evidence admissibility as to which the trial court was not called to rule upon at trial. [Cit.]").

nature of the offense. See OCGA § 17-10-1.2 (b) (1). As noted above, this Court has repeatedly held that any testimony concerning " 'a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence' " is inadmissible in a death penalty trial. *Sermons*, supra, 262 Ga. at 287 (1) (quoting *Payne*, 501 U. S. at 830, n. 2). In holding OCGA § 17-10-1.2 constitutional, we stated the following:

> Obviously, victim impact evidence relating to constitutionally impermissible factors would "unduly prejudice" a jury. Thus, a trial court would abuse the unusually broad discretion granted by the statute by admitting such evidence.

*Livingston*, supra, 264 Ga. at 405 (1) (c). A review of the victim impact testimony in Bryant's case shows that the limit on testimony characterizing the crime was violated several times, as the witnesses testified that the victims were "shot and left in a patch of kudzu as if they were a piece of trash on the side of the road," that the victims were "left under trash and branches, left to die," and that the crimes were "a senseless, selfish act of nothing but wickedness and evil." While some of the witnesses' characterizations may have been supported by the evidence presented at trial, the witnesses did not have personal knowledge of many of the facts to which they testified, and the statements, even if supported by the evidence, were particularly inflammatory and prejudicial coming from members of the victims' families.

Both witnesses also improperly presented their own unduly prejudicial characterizations and opinions of Bryant. We find particularly inflammatory the testimony of Richards' sister. As she came to the conclusion of her half-hour testimony, it resembled a closing argument for the State more than a victim impact statement, as she compared what she perceived as her sister's "chance" for "mercy," for "compassion," for her "rights to live," "her constitutional rights," and "a mere chance [for someone] to help her" with Bryant's "chances to change his life," "to do better," and "to be a productive citizen to society." She told the jurors that Bryant "ha[d] proven that he cannot even be a good inmate," and she repeatedly expressed to them her opinion that Bryant "had many chances" while her sister "never had a chance" because Bryant "ensured on purpose, on purpose, that she will not ever be given the chance."

Obviously, these statements did not constitute the "glimpse into the life" evidence describing the victim's life and the impact of her loss on her family and society that this Court has deemed appropriate. We cannot do otherwise than conclude that the constitutional limits on testimony concerning a witness's characterizations and

opinions about the crime and the defendant were violated. While the family's grief and anger caused by the senseless murders in this case are understandable, and "there is no doubt that jurors generally are aware of these feelings, . . . any decision to impose the death sentence must 'be, and appear to be, based on reason rather than caprice or emotion.' [Cit.]" *Booth*, supra, 482 U. S. at 508 (B), overruled in part by *Payne*, 501 U. S. at 830, n. 2. We cannot say that was the case here.

Having found a constitutional violation, the only question that remains is whether the error was harmless.

> [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U. S. 18, 24 (III) (87 SC 824, 17 LE2d 705) (1967). Reversal is required where there is "a reasonable possibility" that the improperly admitted evidence contributed to the verdict. *Schneble v. Florida*, 405 U. S. 427, 432 (92 SC 1056, 31 LE2d 340) (1972) (citing *Chapman*, 386 U. S. at 24).

(Punctuation omitted.) *Arrington v. State*, 286 Ga. 335, 349 (17) (687 SE2d 438) (2009). See also *Stinkski v. State*, 286 Ga. 839 (691 SE2d 854) (2010) (applying harmless beyond a reasonable doubt analysis to "several minor instances" of victim impact testimony that violated those limitations to victim impact testimony in *Booth* that was left undisturbed in *Payne*). After reviewing the record in this case, we cannot say that there is no reasonable possibility that the violations here did not contribute to the jury's sentencing verdicts. Therefore, we reverse Bryant's sentences for the malice murder convictions and remand for a new sentencing trial.

(b) Bryant also challenges the admission of a slide show composed of photographs of Richards that was presented at the sentencing phase. As this slide show presentation was made without narration except to describe the content of the pictures, which were of Richards alone and with family members at different stages of her life, we do not find that it was unduly inflammatory. See *Lance*, supra, 275 Ga. at 24 (28) (finding photographs of the victims and their family members admissible in the sentencing phase).

(c) Finally, we find no merit to Bryant's contention that the trial court improperly admitted victim impact testimony from four victims of crimes of which Bryant had previously been convicted. The evidence was admissible both as evidence of Bryant's past crimes and as evidence of bad character. See *Arrington*, 286 Ga. at 349 (17) (explaining that the State could have called the victim of a defen-

dant's prior crime to testify about the circumstances of the prior crime).

16. Bryant complains that the trial court committed error by refusing to permit the introduction of several items of evidence in the sentencing phase of trial. While this State's law is permissive with regard to the scope of mitigating evidence that a jury may consider in the sentencing phase, mitigation evidence that does not focus on the character, background, or offense of the particular defendant on trial is properly excluded. See *Barnes*, 269 Ga. at 357-359 (27) (addressing the admissibility of different kinds of mitigation evidence). We conclude that the trial court did not err in excluding the testimony of a witness who had been previously incarcerated as a young person in another state, as it was uncontroverted that this witness had never met, spoken with, or been imprisoned with or in the same state as Bryant. For the same reason, we find no error in the trial court's exclusion of a videotaped documentary produced by the sheriff's department that was composed of statements of former methamphetamine users and individuals who had worked with such persons, as the videotape did not mention Bryant nor his victims, and none of them contributed to its production.

The transcript shows that what Bryant alleges was his deceased grandmother's "statement" was, by defense counsel's own description, actually a document prepared by defense mitigation specialists who had interviewed Bryant's grandmother prior to her death. The trial court found that it was not a statement "of a witness" but "about" a witness, as it was filled with a variety of observations of a third, unknown party and was unreliable. We find no error in the trial court's exclusion of this evidence. See *Gulley v. State*, 271 Ga. 337, 346-347 (13) (519 SE2d 655) (1999) (finding no error in the exclusion of mitigating evidence in the sentencing phase where there were insufficient circumstances of reliability).

Finally, the trial court did not err in excluding evidence that Bryant was never offered a plea agreement. "Evidence concerning the machinations of the criminal justice system outside the defendant's control, such as whether the defendant was offered a plea bargain of life, is ... inadmissible [in the sentencing phase]." *Barnes*, 269 Ga. at 359-360 (27). See *Terrell v. State*, 271 Ga. 783, 787 (10) (523 SE2d 294) (1999) (holding that a defendant's conditional offer to plead guilty is not admissible in the sentencing phase).

17. In light of our decision in Division 15, we need not address Bryant's complaint that the State in its closing argument improperly minimized to the jurors their responsibility for evaluating whether Bryant should receive a death sentence. However, we remind the State that, while "it is not improper to argue that the defendant

himself — and not the police, the prosecutor, or the jury — is responsible for his punishment" (*Hicks v. State*, 256 Ga. 715, 731 (23) (352 SE2d 762) (1987) (citation omitted)), any argument urging the jury not to view itself as finally determining the appropriateness of the defendant's punishment is improper. See *Caldwell v. Mississippi*, 472 U. S. 320 (105 SC 2633, 86 LE2d 231) (1985).

18. Viewed in their entirety, the sentencing phase jury charges on mitigating and aggravating circumstances, which were taken from the pattern jury charges, were not improper and misleading. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, §§ 2.15.30, 2.15.50 (3d ed. 2005). See *Rhode v. State*, 274 Ga. 377, 384 (15) (552 SE2d 855) (2001); *Ledford v. State*, 264 Ga. 60, 69 (20) (439 SE2d 917) (1994).

19. Pretermitting whether Bryant's request to "review for error the Trial Court's ruling that Mr. Bryant's tattoos were admissible in the sentencing phase as a non-statutory aggravating circumstance" is properly before us (see *Henry v. State*, 278 Ga. 617, 620 (1) (604 SE2d 826) (2004) (enumerations of error included in an amended appellate brief filed before oral argument are properly before this Court)), the record shows that Bryant first introduced testimony regarding his tattoos in the guilt/innocence phase and that he testified that, among other tattoos, while in prison, he had the words, "f- - - you," tattooed inside the back of his lip to display to the guards when they performed visual body cavity searches of him. Under those circumstances, we find no error in the trial court's order stating "that evidence may well be relevant and admissible as a non-statutory aggravating circumstance since the defendant's character is an issue in that phase of this proceeding." See, e.g., *Fugitt v. State*, 256 Ga. 292, 296 (1) (348 SE2d 451) (1986) ("[A] defendant's character in general, and his conduct while in prison, are relevant to the question of sentence. [Cits.]").

20. In light of our holding in Division 15, we need not address Bryant's contention that his death sentence is excessive and disproportionate punishment.

21. The jury supported its recommendation for a life sentence without parole for Kilgore's murder on its finding of the following statutory aggravating circumstances: the murder was committed during the commission of another capital felony, to wit: Richards' murder; and the murder was committed during the commission of the armed robbery of Kilgore. See OCGA § 17-10-30 (b) (2). The jury supported its recommendation of the death sentence for Richards' murder on its finding of the following statutory aggravating circumstances: the murder was committed during the commission of another capital felony, to wit: Kilgore's murder; the murder was committed during the commission of the armed robbery of Kilgore;

the murder was committed during the commission of the armed robbery of Richards; and the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind. See OCGA § 17-10-30 (b) (2), (7). We find that the evidence presented at trial was sufficient to support the jury's finding beyond a reasonable doubt the existence of at least one statutory aggravating circumstance, and, therefore, Bryant will not be subjected to double jeopardy in a second jury trial for sentencing on his malice murder convictions. See *Carruthers v. State*, 272 Ga. 306, 318 (19) (528 SE2d 217) (2000).

*Judgment affirmed in part and reversed in part. Hunstein, C. J., Benham, Thompson and Hines, JJ., and Judge William M. Ray II, concur. Carley, P. J., concurs in part and dissents in part. Nahmias, J., disqualified.*

CARLEY, Presiding Justice, concurring in part and dissenting in part.

I completely and wholeheartedly agree with the majority's finding of no reversible error in the guilt/innocence phase of Bryant's trial and its affirmation of the judgment of conviction on all charges. However, I respectfully dissent to the reversal of the death sentence and the sentence of life without parole based upon the majority's conclusion that the trial court erred in allowing the State to introduce victim impact testimony in the sentencing phase.

To the contrary, I believe that the trial court meticulously complied with the mandates of the United States Supreme Court and this Court in making its determination. The majority recognizes that the controlling authority is *Payne v. Tennessee*, 501 U. S. 808 (111 SC 2597, 115 LE2d 720) (1991). In *Payne*, the Supreme Court held that

> [v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities. . . . Courts have always taken into consideration the harm done by the defendant in imposing sentence, and the evidence adduced in this case was illustrative of the harm caused by [Bryant's] double murder.

*Payne v. Tennessee*, supra at 824-825. Subsequent to *Payne* this Court found OCGA § 17-10-1.2 to be constitutional in light of the statutory safeguards. *Livingston v. State*, 264 Ga. 402, 404-405 (1) (c) (444 SE2d 748) (1994). Contrary to the conclusion reached by the majority, I do not believe that we can hold that the trial court abused its "unusually broad discretion" in allowing the victim impact

evidence in this case. *Livingston v. State,* supra at 405 (1) (c). I believe that this Court should affirm the convictions and the sentences in their entirety. Accordingly, I respectfully dissent.

DECIDED MARCH 18, 2011.

*Carl P. Greenberg, Gerald P. Word, Josh D. Moore, King & Spalding, Damien C. Moore, Victoria M. Calvert, William E. Hoffmann, Jr., Jessica J. Hagen, John W. Harbin, Brian Stull, Wyatt Feeler,* for appellant.
*David McDade, District Attorney, James A. Dooley, Susan V. Boleyn, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Patricia Attaway Burton, Senior Assistant Attorney General, Theresa M. Schiefer, Assistant Attorney General, Emily R. Roselli,* for appellee.